# EXHIBIT A

EFiled: Apr 08 2025 11:07AM EDT
Transaction ID 76013865
Case No. 2025-0374-

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| HASH ASSET MANAGEMENT LTD.,<br><br>Plaintiff,<br><br>v.<br><br>DMA LABS, INC., ICHI FOUNDATION, NICK POORE, BRYAN GROSS, TYLER CHRISTIAN PINTER, JULIAN BRAND AKA JULIAN FINCH-BRAND,<br><br>Defendants. | CASE NO. |

## VERIFIED COMPLAINT

Plaintiff HASH Asset Management Ltd. ("HASH" or "Plaintiff"), files this complaint against defendants DMA Labs, Inc. ("DMA"), ICHI Foundation ("ICHI Foundation"), Nick Poore ("Poore"), Bryan Gross ("Gross"), Tyler Christian Pinter ("Pinter"), Julian Brand aka Julian Finch-Brand ("Brand," and, collectively with DMA, ICHI Foundation, Poore, Gross and Pinter, "Defendants"), and states as follows.

## INTRODUCTION

1. This is an action for fraud, breach of contract, breach of fiduciary duty, conversion and other torts stemming from Defendants fraudulent scheme

that resulted in over $16.2 million in losses to the Plaintiff. Defendants promised that their yield earning cryptocurrency "liquidity pool" offering was safe and "decentralized." They also promised that changes to the offering would be subject to a "community vote." These representations were false. Contrary to Defendants' representations about "decentralization," Defendants maintained complete control over their yield earning liquidity pool, called Rari Pool 136. After Plaintiff invested millions of dollars' worth of stablecoin, Defendants exerted their control, made unilateral decisions, and executed secret crypto trades which caused the collapse of Rari Pool 136. As a result, Plaintiff lost over $16.2 million.

2. After conducting a crypto tracing investigation, Plaintiff has identified that the key transactions which caused the collapse were executed by digital addresses linked to DMA and ICHI Foundation insiders. Some of these transactions were designed to prop up the price of Defendants' own cryptocurrency, ICHI. Gross, the CEO of DMA and self-appointed ICHI Foundation "steward" admitted to transferring the "Community Treasury," which contained investors' deposits, without the required community vote. The declaration of crypto tracing expert Paul Sibenik has been attached to this complaint (the "Sibenik Decl.") which describes the key crypto tracing findings.[1]

[1] The Sibenik Decl. is incorporated by reference as if fully restated herein and attached hereto as **Exhibit B**.

3. On January 15, 2021, Defendants issued their own crypto which they called, ICHI. Following ICHI's issuance, Defendants offered a yield earning opportunity, called Rari Pool 136. Investors, like the Plaintiff, would provide crypto to Defendants which would fund Rari Pool 136. Borrowers who posted crypto as collateral could borrow from Rari Pool 136. The initial investors, like the Plaintiff, would earn a yield once those debts were paid. Defendants promised that liquidity protections were in place that would shield Rari Pool 136 investors' crypto. As Plaintiff discovered too late, the liquidity protections Defendants touted were illusory and when the opportunity arose, Defendants unilaterally removed those protections to protect their own crypto at the expense of crypto belonging to the Plaintiff.

4. A series of repeated crypto transactions began to threaten Rari Pool 136's viability. Unknown to Plaintiff at the time, it appears that digital addresses attributed to Defendants executed these transactions. These transactions ultimately caused Rari Pool 136 to fail. To make matters worse, Defendants unilaterally transferred millions of dollars' worth of users' crypto out of the "Community Treasury" (defined below) and into Rari Pool 136. Defendants were supposed to only move the "Community Treasury" following the solicitation of a community vote. They did not take a vote, and that Community Treasury crypto is now lost.

5. Defendants began their scheme by enticing investors, including

Plaintiff, to deposit valuable "stablecoins"[2] and other crypto into a Community Treasury. The Treasury then issued new crypto called "oneTokens" to the depositing investors. OneTokens are ICHI-designed stablecoins.

6. Defendants also touted the benefits of an "Angel Vault," a liquidity protection device that would create a protective "buy wall" to stabilize the value of ICHI. A "buy wall" stands ready to buy a cryptocurrency at a price in order to set the floor. If executed successfully, a buy wall ensures that the price of a particular crypto never falls below that price. However, a buy wall only works if there is enough liquidity to execute transactions at a given price. The Angel Vault was supposed to be a "buy wall." Like Defendant's other offerings, this failed.

7. The offering required investors to first purchase oneTokens and then remit those oneTokens to Rari Pool 136. Borrowers then pledged crypto as collateral to borrow investors' oneTokens from Rari Pool 136, and the investors earned a "yield" paid in the form of ICHI cryptocurrency.

8. Rari Pool 136 had two other key features. First, it had a loan-to-value ("LTV") ratio of 85%, meaning that someone pledging $100 USD worth of collateral could borrow the oneToken equivalent of $85.00. This ratio is extremely high. Second, Rari Pool 136 allowed borrowers to use unlimited amounts of ICHI

[2] A "stablecoin" is a form of cryptocurrency designed to have a price that does not fluctuate. The stablecoins here were meant to be worth $1.00 USD per unit. A more detailed definition of "stablecoin" may be found on page 5, *infra*.

(which is not a stablecoin) as collateral to borrow a number of cryptocurrencies, including stablecoins.

9. HASH was one of the lead investors who participated in Rari Pool 136 by providing crypto for others to borrow. HASH did not buy Defendants' risky ICHI. But HASH earned ICHI as "yield" for providing stablecoins to Rari Pool 136 for others to borrow.

10. The primary focus of Defendants' scheme was to: (1) displace the stablecoin and other valuable cryptocurrencies from Rari Pool 136 in exchange for the highly risky ICHI; (2) use borrowed stablecoin or other cryptocurrencies to purchase more ICHI, which would drive up the price of ICHI; and (3) use that purchased ICHI as collateral in Rari Pool 136 to borrow more stablecoins and other cryptocurrencies and to continuously repeat this cycle. This scheme was possible because ICHI could be used as both collateral for Borrowers and the proceeds of the loan from Rari Pool 136. As a result, while Plaintiff thought that the oneTokens and other safer cryptocurrencies were protected, Rari Pool 136 ended up being completely reliant on the price of ICHI. When ICHI dropped precipitously in value, Defendants executed a series of trades to protect themselves, which caused the rapid collapse of Rari Pool 136 and the loss of the Plaintiff's investments.

11. The Defendants chose to issue an unregistered securities offering,

complete with their own crypto, ICHI, and a "yield earning" protocol, Rari Pool 136. Defendants also lied to their investors, including Plaintiff, who relied on these lies in deciding to trust Defendants with its money. Defendants promised their investors the safety and protection of community voting, but as soon as Defendants' own crypto was at risk, Defendants secretly executed unilateral transactions to protect their own crypto, leaving Plaintiff with the worthless Rari Pool 136. Accordingly, Plaintiff brings this lawsuit to hold Defendants accountable and to recover for their losses resulting from Defendants' misconduct.

## I. THE PARTIES

12. Plaintiff HASH is a registered Cayman Islands entity.

13. Defendant DMA is a Delaware corporation (*see* **Exhibit C**), which purports to have its principal place of business in Raleigh, North Carolina. DMA created and wrote the software for Ichi. *See* **Exhibit D**. Upon information and belief, DMA is not registered to conduct business in any state but Delaware.

14. Defendant ICHI Foundation is a Cayman Islands business entity with its principal place of business in Raleigh, North Carolina.

15. Defendant Gross is a natural person and a citizen of North Carolina. At all relevant times Mr. Gross was CEO of DMA and the self-appointed "network steward" of ICHI. Defendant Gross was also the incorporator for DMA, and listed his Delaware address on the Certificate of Incorporation. *See* **Exhibit C**.

16. Defendant Poore is a natural person and a citizen of North Carolina. At all relevant times Mr. Poore was the Chief Technical Officer of DMA. Together with Mr. Gross, Defendant Poore served as Director for DMA. *See* **Exhibit C**.

17. Defendant Pinter, whom upon information and belief is an associate of and lives with Defendant Brand in Florida, was also directly involved in the pump and dump fraudulent scheme detailed herein.

18. Defendant Brand is the former Business Development Manager for Ichi and resides in Florida. As uncovered by the investigation undertaken by Plaintiff, which involved reconstructing various purposefully deleted accounts and data, Defendants Pinter and Brand operated two primary wallets involved in the pump and dump scheme of Ichi and were direct participants in the fraudulent scheme involving DMA and Ichi, together with Defendants Poore and Gross.

## II. JURISDICTION AND VENUE

19. The Court has personal jurisdiction over Defendants because DMA is subject to general jurisdiction in Delaware and the remaining Defendants are subject to specific jurisdiction in Delaware, as alleged herein, as they worked and continue to work directly with DMA with respect to the transactions that led to Plaintiff's damages.

20. In addition, because the facts alleged in this Complaint arise from a single transaction or occurrence, the Court also has pendent personal jurisdiction

over all Defendants under the doctrine articulated in *Sierra Equity Grp., Inc. v. White Oak Equity Partners*, LLC, 650 F. Supp. 2d 1213 (S.D. Fla. 2009) (citing *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004); *ESAB Grp. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.1993)); 4A Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. § 1069.7, n.31 (4th ed. 2020).

21. Further, under Delaware's long arm statute, this Court has jurisdiction over ICHI, Gross, Poore, Pinter and Brand as each of them (i) transacted in business and worked at DMA, which is incorporated in Delaware, (ii) entered into contracts, through DMA, in Delaware, including those at issue in the breach of contract claims herein, (iii) caused tortious injury in both Delaware and/or outside of this State by an act or omission outside the State, and the Defendants regularly did and solicited business, engaged in any other persistent course of conduct in Delaware and derives substantial revenue from services, or things used or consumed in Delaware.

22. Indeed, by acting through, working for, and orchestrating their fraudulent scheme, through DMA, as the main entity for running the subject business in the United States, Defendants ICHI, Gross, Poore, Pinter and Brand, "reasonably anticipated ...that [their]...actions might result in the forum state

exercising personal jurisdiction over [each of them] in order to adjudicate disputes arising from those actions." *See, e.g. CH Associates XI, LLC v. 1102 West Street, LP, C.A.* N24C-09-260FWW, (Delaware Superior Court March 3, 2025).

23. The Court of Chancery has jurisdiction over this dispute pursuant to 10 *Del. C.* §341 since the primary causes of action asserted are equitable in nature.

## III. FACTUAL ALLEGATIONS

### A. Background on Cryptocurrency

#### i. Cryptocurrency and Blockchain Technology

24. "Cryptocurrency" or "crypto" refers to various digital assets including "coins" and "tokens" that are securely encrypted through blockchain technology. A "blockchain" is a string of code that forms an immutable, distributed ledger of all transactions involving the cryptocurrency or cryptocurrencies within that blockchain.

25. Crypto transactions are submitted to the blockchain and executed in batches called "blocks." A "block" reflects all crypto transactions that occurred on the blockchain at a particular time. Blocks are sequenced into a "chain." That is why it is called a "block"-"chain."

26. There are multiple blockchains. The first and most popular is the Bitcoin blockchain which is home to the cryptocurrency Bitcoin (BTC). Another popular blockchain is the Ethereum blockchain, home to the cryptocurrency Ether

(ETH). The Ethereum blockchain makes it relatively easy for anyone to create new cryptocurrencies that reside on the Ethereum blockchain. These Ethereum-based cryptocurrencies are called "ERC-20" compliant tokens. ICHI is an ERC-20 compliant token.

27. Cryptocurrency must be stored in a digital "wallet." Each cryptocurrency wallet has a public key which functions like an "address" for the wallet to receive cryptocurrency.[33] A party can pay someone in cryptocurrency by sending the cryptocurrency to the recipient's wallet address. These public key wallet addresses are 40-digit alphanumeric strings, such as "0x36994486c6e97c170065899d8659a28d7371c8." Anyone can use the platform Etherscan (https://etherscan.io/) to see a record of a wallet's complete transaction history.

**ii. Stablecoins**

28. Like many assets, a cryptocurrency's value is typically a function of what people are willing to pay for it. Many people buying cryptocurrency are speculating that the cryptocurrency's price will go up. However, there is a type of

---

[3] Cryptocurrency wallets also have a "private key," an access code that controls the wallet's contents. The private key is kept secret, like a pin number for a bank account, as it lets the wallet's owner access and control the cryptocurrency inside. Having a private key is akin to having possession and control of the cryptocurrency itself.

cryptocurrency, known as a "stablecoin," which is designed to always maintain a value equal to that of a stable asset, such as the U.S. dollar or gold. Stablecoins maintain their 1:1 ratio with such assets by keeping reserves of fiat currency, commercial paper, short-term government debt, or another commodity or currency. The value of the reserves should, when done properly, correspond to the value of the stablecoin in circulation. A stablecoin relevant to this case is USD Coin, or "USDC."

**iii. "Decentralization"**

29. Many crypto projects purport to be "decentralized," in that they disperse control within a community of market participants that must vote on governance matters. Decentralization and community voting rights are key selling points for market participants. With community voting rights, a participant knows that new rules governing how his or her crypto is treated will not go into effect unless a majority of stakeholders agree to the change. Community voting systems are meant to protect against centralized bad actors making unilateral decisions that harm stakeholders.

30. There are several reasons why project teams may promote their protocol as "decentralized." A primary reason is that this may help them avoid designation as a security and related SEC oversight. Although the SEC's stance on whether some cryptocurrencies are securities is unclear, the SEC has publicly

stated that Bitcoin and Ether are not "securities" because they are not centrally controlled.[4] Under the U.S. Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an investment contract is not a security unless it involves investing in a "common enterprise with the expectation of profits to be derived solely from the efforts of others."

31. Accordingly, to avoid their cryptocurrency offering from being considered a "security," many new cryptocurrency projects label themselves a "decentralized autonomous organization" ("DAO"). While some DAOs are truly decentralized, many projects that call themselves DAOs are actually run by a few individuals or a corporate entity.

32. "Decentralized finance" or "DeFi", describes lending, yield earning, and other transactions that are similar to traditional banking but occur through decentralized entities governed by smart contracts. An important element of many DeFi projects is "staking." Staking involves lending tokens to a protocol in exchange for interest, called "yield," which may or may not be denominated in the same type of token that "staker" deposited.

**iv. Liquidity Pools**

33. Staking often occurs through an investment vehicle called a "liquidity

[4] *See Remarks at the Yahoo Finance All Markets Summit: Crypto*, William Hinman, U.S. SEC. & EXCH. COMM'N (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

pool." Investors stake tokens to the pool, which people can then borrow from. Lenders earn "yield" based on their pro rata percentage interest in the pool. Investors who earn yield this way are said to be "providing liquidity," "liquidity mining," or "yield farming."

**B. Defendants Create ICHI and Solicit Plaintiff to Invest.**

34. Defendant Bryan Gross, the CEO of DMA, and self-proclaimed "steward" of the ICHI enterprise, created the "ICHI Protocol" in or around June 2020 through October 2020. Key components of the ICHI Protocol include: (1) ICHI, the cryptocurrency; (2) oneToken or "branded dollars," the stablecoin; (3) the Angel Vault, the "buy wall," (4) the Treasury; and (5) Rari Pool 136.

35. OneTokens, according to Defendants, maintain their price stability by virtue of the stablecoin and other crypto assets deposited in the Treasury, which supposedly allow oneTokens to be redeemed for $1.00 each. This, in turn, is supposed to promote confidence in the underlying crypto in the Treasury and create a self-governing "community" around that crypto.

36. Mr. Gross—operating through a Cayman Islands financial services company— established Defendant ICHI Foundation in or around October 2021 to create further separation between him and ICHI and to bolster the misleading impression that ICHI is decentralized. The Cayman Islands-based ICHI Foundation has a single director, whose financial services company offers "a

discreet . . . approach to your corporate governance needs."[5]

37. Upon information and belief, DMA and the ICHI Foundation are under common control.

38. Defendants maintain a "Documents" section on the ICHI website that contains an offering memorandum.[6] Though Defendants have since revised their "Documents," a true and correct copy of the "Documents" webpage during the relevant time ("Offering Documents") is attached to this Complaint as **Exhibit A**.

39. The Offering Documents explain that the ICHI Protocol permits the depositing of cryptocurrencies into the "Treasury" along with an equal value of USDC. In exchange, depositors receive a oneToken. Defendants promised that investors would have the right to vote on control over the Treasury's contents and could redeem a oneToken at any time for "exactly 1 USDC (or other hard pegged stablecoin in the [Treasury]), less a redemption fee." Ex. A at 38.

40. Specifically, Defendants represented that oneTokens "provide holders voting power over the . . . Community Treasury which holds the scarce crypto assets and can be strategically deployed *based on community governance*." *Id.* at 33 (emphasis added). Said differently, "[*o*]*nly* the community of each individual project can govern the treasury backing its currency." Ex. A at 5

[5] *What We Do: Directorships*, SILVERSIDE MANAGEMENT LTD., https://silversidemanagement. ky/director-services/
[6] *Welcome to the ICHI Docs*, ICHI.ORG, https://docs.ichi.org/home/

(emphasis added). As later events revealed, these representations were false.

41. Defendants also falsely represented that oneTokens could be "Redeem[ed] for Exactly $ 1," and had "**No**" liquidation risk. *Id.* at 31 (emphasis original).

**oneTokens** are ICHI designed stablecoins built for cryptocurrency communities. oneTokens keep their value at $1, are purely on-chain, and are supported by a community treasury in each oneToken's native project tokens. They provide the hard peg of centralized stablecoins without sacrificing on decentralization.

ICHI enables any community to deploy a project **Decentralized Monetary Authority (DMA)** to manage their oneToken.

**Table 1: Feature Comparison by Category of Stablecoin**

| Feature | Algorithmic | Fiat Backed | Crypto Backed | ICHI Stablecoins |
|---|---|---|---|---|
| Mint for Exactly $1 | No | Yes | No | **Yes** |
| Redeem for Exactly $1 | No | Yes | No | **Yes** |
| 100% On-Chain Reserves | Yes | No | Yes | **Yes** |
| Community Treasury | No | No | No | **Yes** |
| Liquidation Risk | No | No | Yes | **No** |

42. Defendants touted oneTokens as safe investments, contrasting them with "volatile, scarce coins unusable for real business," and representing that, during recent periods of market volatility, "all oneTokens were able to maintain their pegs to exactly $1 while few other stablecoins did." *Id.* at 78, 80.

43. In addition to the Treasury, the investment also purportedly included an Angel Vault which allows the creation of a "buy wall." The Angel Vaults would then use Uniswap v3 concentrated liquidity to ensure that the Angel Vaults stood ready to purchase ICHI at a predetermined price. This would establish a floor price of ICHI.

44. But as soon became clear, Defendants statements about the Angel Vaults' purported stabilizing effect were false. In fact:

a. Defendants' leveraged investment products could, and did, easily overwhelm the Angel Vault buy wall and destabilize the price of ICHI; and

b. To maintain stability, Angel Vaults' coding needed to be regularly updated to rebalance asset concentrations and pricing algorithms in response to continuous market changes. Defendants did not regularly update this coding but instead did so only manually and sporadically.[7]

45. In addition to the minting process of oneTokens, and the Angel Vault buy wall, a third part of Defendants' investment vehicle involved having new oneToken investors stake their newly acquired oneTokens in Defendants' ICHI liquidity pools to earn yield.

46. The yield earned by investors in ICHI liquidity pools was paid in the form of ICHI crypto. Ex. A. at 14–15.

47. The Offering Documents disclosed certain risks of investing in ICHI

---

[7] The Offering Documents state that rebalancing occurs "about once a week." Ex. A at 27. But Defendants updated these materials to state that the rebalancing occurs only "on an as-needed basis." *ICHI's Vaults*, ICHI DOCS, https://docs.ichi.org/home/concepts/ichis-vaults. On information and belief, Defendants never regularly rebalanced the Angel Vaults and they later updated the Offering Documents after the Rari Pool 136 collapsed because the previous version of the Offering Documents was misleading.

liquidity pools. Ex. A at 66–67. Specifically, risks of technical malfunction and inherently uncertain market forces. At no point did Defendants disclose that oneTokens did not actually confer promised voting rights or that Defendants could unilaterally move investors' crypto from the Treasury and into Rari Pool 136.

48. In addition to the Offering Documents, Defendants published articles touting the desirability of investing in ICHI. For example, Mr. Gross laid out a "Roadmap to $1B in Community Governed Value" which promised that Angel Vaults could insulate investors' cryptocurrency from volatile market fluctuations via the protective, stabilizing buy wall effect.[8] In another article, ICHI Foundation and DMA represented that oneTokens are "stable assets . . . creating a reliable, everyday currency that can easily be used to pay for business operations and investing in DeFi."[9]

49. Defendants also stated that, "[a]lthough this sounds too good to be true (it is kind of), there is no magic here . . . Angel Vault introduces a unique opportunity for crypto projects to manage their token liquidity and remove market volatility. It also offers investors . . . a unique exposure . . . usually only accessible

---

[8] Brian Gross, *ICHI's Roadmap to $1B in Community Governed Value*, MEDIUM (Dec. 21, 2021), https://medium.com/ichifarm/ichis-roadmap-to-1b-in-community-governed-value-93b85a4cbfda.

[9] Daniel Tal, *Angel Liquidity Vaults: Get Comfy this Crypto Winter*, MEDIUM (Nov. 24, 2021), https://medium.com/ichifarm/angel-liquidity-vaults-uniswap-v3-supercharged-for-lps-and- crypto-projects-f15bc17b3946.

for large market makers and sophisticated players."[10]

50. Bryan Gross personally promoted his investment products on podcasts. In one podcast episode, Gross cited his prior employment with IBM and Amazon to bolster his credibility (and thus his project's credibility). Gross said he had "a very experienced team that has really zeroed in on security as a core value."[11] He also told audiences that, if he had $1,000 to invest in cryptocurrency, he would invest it in an Angel Vault.[12]

51. Plaintiff reviewed the Offering Documents in or around late 2021. Around the same time, Defendants conveyed to Plaintiff what, in substance, was the same information quoted in the promotional articles and oral statements described above. Plaintiff also communicated directly with Defendants through a Discord[13] channel in which Defendants provided background concerning the nature of the ICHI investment and Rari Pool 136.

52. HASH learned about ICHI in or around fall 2021, based on a review

[10] LiorGoldenberg, *Breaking Down Angel Vaults*, MEDIUM (Mar. 15, 2022), https://medium.com/ichifarm/breaking-down-angel-vaults-eb3659e5b7b3.

[11] *See, e.g.*, *Inside Track with Bryan Gross from ICHI*, CRYTOQUESTION (Aug. 14, 2021), https://www.spreaker.com/user/cryp/inside-track-with-ichi.

[12] *Inside Track with Bryan Gross, Network Steward of ICHI*, CRYPTOQUESTION (Jan. 1, 2022), https://www.spreaker.com/user/cryp/inside-track-ichi-2-update.

[13] Discord is an online communications and messaging platform widely used throughout the crypto industry.

of the documentation on the ICHI website, including the Offering Documents, and other public sources. The main feature of the ICHI oneToken product was that it was marketed as an overcollateralized stablecoin, which could always be credited for USDC with a small fee of 0.5%. After making initial investments in ICHI, HASH noted it was one of the largest liquidity providers and contacted the ICHI team via Discord. On January 14, 2022, a group on Discord was created entitled “HashCIB<>ICHI.”

53. On January 20, 2021, members of the ICHI team informed HASH, via Discord, about the opportunity to invest in Rari Pool 136. The ICHI team informed HASH that ICHI was ending “deposit rewards as now you can earn by providing on[e]UNI on Rari and use it as collateral to borrow other tokens, or just leave it there and earn just like in the deposits!” Based upon this description and other publicly available information, HASH understood that Rari Pool 136 would permit HASH to earn yield by depositing crypto in Rari Pool 136.

54. Based on these public solicitations from Defendants, HASH remained in contact with the ICHI team, which continued speaking with HASH through various communication channels, including, but not limited to, Discord and Telegram. These conversations continued through mid-2022.

55. During these communications, DMA and ICHI Foundation, through Mr. Gross, Mr. Poore, others, solicited HASH to invest in the ICHI Protocol. In

addition, the HASH team had other telephone communications with members of the ICHI project team on or about February 1, March 8, and March 10, 2022. After being introduced to the team in an introductory phone call, during the March 10 call, Mr. Gross explained the mechanics of the Angel Vaults and how they were organized to the HASH team. Mr. Gross noted that Rari Pool 136 was protected by a "liquidity pool" and that ICHI would provide rewards through Rari Pool 136.

56. Based upon these public and private solicitations from Defendants, between December 2021 and April 2022, HASH invested the cryptocurrency equivalent of approximately $16 million USD by transferring USDC to the ICHI Treasury. In return, HASH received an equivalent value oneTokens (in a combination of "oneUNI," "oneBTC," and "oneDODO"). HASH staked oneTokens and additional USDC to Rari Pool 136.

57. In making these investments, Plaintiff relied on Defendants' representations about the ICHI Protocol, including representations about how the platform would function, representations about the safeguards protecting the platform, and representations that all decisions concerning crypto deposited into the Treasury would be subject to community vote.

### C. In Violation of Plaintiff's Community Voting Rights, Defendants Transfer Treasury Contents to Rari Pool 136

58. Rari Pool 136 participants could use ICHI crypto as collateral for

borrowing. This enabled Defendants to generate leverage[14] for trading while shifting most of the associated risk to the lender, because the borrowed oneTokens were stable but the collateralized ICHI was not.

59. Rari Pool 136 also had an 85% LTV ratio. This allowed someone to borrow up to 85% of the value of the collateral they pledged. This increased the risk of default if the value of the collateral dropped.

60. Beginning in January 2022 and continuing through mid-April 2022—and unbeknownst to Defendants' investors, including Plaintiff—Defendants began shifting investor- deposited stablecoins *out* of the supposedly community-controlled Treasury, and into Rari Pool 136. Specifically, Defendants transferred tens of millions of dollars' worth of stablecoin (oneTokens and USDC) out of the Treasury and into Rari Pool 136.

61. Defendants did this unilaterally and without the required community vote. This violated the governance rights that Defendants promised Plaintiff they would enjoy as investors in ICHI.

62. These unauthorized transfers also weakened the Angel Vaults' price-protective "buy wall," because the buy wall was formed from oneTokens, and the oneTokens depended on the Treasury for their stability.

[14] Leverage is trading with loaned funds to increase buying power. It increases potential returns, but also potential losses.

63. ICHI's price began climbing sharply in late March 2022. Unbeknownst to Plaintiff, increase in price was due to a leveraged borrowing scheme through Rari Pool 136 that Defendants were executing.

64. The scheme worked as follows: (a) post ICHI as collateral to borrow stablecoins— including those Defendants had already moved into Rari Pool 136 without the required community vote; (b) use the borrowed stablecoins to purchase more ICHI, thus driving up the price; (c) post the newly acquired ICHI as collateral in Rari Pool 136 to buy more stablecoin; and (d) repeat the process.

65. HASH became concerned as the price of ICHI continued to rise. HASH contacted the ICHI team and discussed the matter with Bryan Gross on or around March 24, 2022. Mr. Gross showed HASH calculations purporting to establish that the ICHI was still "undervalued." He further assured HASH that (a) the buy wall remained strong and could absorb sales even at the increasingly higher prices if wallets began to liquidate their holdings; and (b) DMA, through the ICHI Foundation, would make necessary adjustments to the buy wall's parameters to ensure it remained strong. These representations were false.

66. On April 6, 2022, Defendants—again without a community vote—moved approximately $6.8 million in BTC and USDC from the Treasury and into Rari Pool 136.

67. On April 7, 2022, several large cryptocurrency wallets engaged in the

same pattern of cyclical borrowing described above, using Rari Pool 136 to leverage Plaintiff's assets and further pump up the price of ICHI.

68. From April 7 to April 8, 2022, the value of a single ICHI increased from $79 to $139, and the total value of all ICHI in circulation grew to $599 million.

69. Amid this increase, Defendants emptied the rest of the oneBTC Treasury into Rari Pool 136, moving approximately $4 million in USDC without a vote. These new stablecoins in Rari Pool 136 were borrowed almost immediately. In fact, Defendants had now emptied the entire contents of all three Treasuries—oneUNI, oneDODO, and oneBTC—into Rari Pool 136.

70. The net effect of these transactions was to siphon stablecoins out of Rari Pool 136 and replace them with inflated ICHI as collateral. Further, Defendants failed to adjust the buy wall parameters to ensure its continued viability as the price of ICHI continued to climb.

71. Now, there were tens of millions of dollars in outstanding, borrowed stablecoin— but near-zero liquidity remaining in the Angel Vault buy wall to

absorb sales of any ICHI collateral. As one Twitter user observed:[15]







[15] Jonwu.eth (@jonwu_), Twitter (Apr. 12, 2022), https://twitter.com/jonwu_/status/1513857064153452545.

72. On or around April 11, 2022, one of the Defendants' wallets sold approximately $10 million in ICHI crypto. The value of ICHI collateral in Rari Pool 136 immediately plunged.

73. The protocol began forcibly liquidating borrowers' holdings. This set off a chain reaction of cascading liquidations, and a bank run occurred as investors raced to sell their ICHI or otherwise recover the crypto they had staked to Rari Pool 136.

74. Upon information and belief, Defendants were among the first to dump their ICHI holdings, thus reaping massive illicit windfalls.

75. Because Defendants had already emptied the Treasury to accelerate the price increase price, there was no liquidity in the Treasury from which to redeem oneTokens.

76. As one industry observer noted, innocent investors such as Plaintiff now faced the prospect of worthless collateral, irredeemable oneTokens, and nothing to enforce the debt obligations of Defendants who engaged in the serial borrowing scheme.[16]

[16] FreddieRaynolds (@FreddieRaynolds), Twitter (Apr. 11, 2022), https://twitter.com/FreddieRaynolds/status/1513687632756318213.

77. 


78. Plaintiff tried diligently to mitigate its damages by liquidating their own crypto holdings from the ICHI Protocol.

79. HASH faced much the same situation. It has lost approximately $16 million and is now the largest holder of valueless oneUNI oneTokens on ICHI's network. HASH's losses, and the cryptocurrency wallets in which it suffered those losses, are displayed in **Table 1**.

| | |
|---|---|
| 0x8D[redacted] | $3,050,302 |
| 0xd7[redacted] | $1,514,979 |
| 0x0d[redacted] | $304,655 |
| 0x18[redacted] | $521,419 |
| 0xBC[redacted] | $806,153 |
| 0xCA[redacted] | $320,172 |
| 0x14[redacted] | $162,774 |
| 0x47[redacted] | $655,446 |
| 0x83[redacted] | |
| 0xF5[redacted] | $2,735,535 |
| 0x82[redacted] | |
| 0x73[redacted] | |
| 0xdE[redacted] | $6,132,300 |
| 0x5a[redacted] | |
| **TOTAL** | $16,203,735 |

80. As observers on Twitter noted, investors like Plaintiff had invested strong crypto assets—including fiat-backed stablecoins—into the ICHI Platform, only to "get rugged" by Defendants.[17]




[17] Jonwu.eth (@jonwu_) TWITTER (Apr. 12, 2022), https://twitter.com/jonwu_/status/1513857064153452545.

**D. Defendants Conceal Their Misconduct**

81. After executing this "rug pull" on their investors, Defendants made a series of false statements laying blame on market forces and unspecified third parties.

82. For example, Defendants falsely stated that "our core technology—Angel Vaults and Branded Dollars [i.e., oneTokens] were not the cause of or related to yesterday's volatility."[18] The opposite is true. Defendants' raiding of the Community Treasury was directly responsible for the price spike and collapse, as was the fact that oneTokens did not actually afford any real governance rights.

83. In a FAQ about Rari Pool 136, DMA responded to the question "Is this a rug pull or a scam? Did the ICHI team sell tokens?" by answering "No, this is not a rug pull or scam. The ICHI team and ICHI Foundation were harmed by the issues related to Rari pool #136. The wallet that made the initial $10M sale is not affiliated with the ICHI team."[19] Though falsely disclaiming a link to the first $10 million dump, Defendants did not deny selling during the collapse.

84. In fact, (i) Defendants were responsible for the ICHI price surge; (ii)

[18] ICHI, *Postmortem of Pool #136*, MEDIUM (Apr. 12, 2022), https://medium.com/@ichidao/ postmortem-of-pool-136-3cb22102065a.
[19] ICHI, *ICHI – POOL #136 FAQS*, MEDIUM (Apr. 13, 2022), https://medium.com/@ichidao/ichi- pool-136-faqs-aa9ca59602f3.

once the ICHI collapse was foreseeable to Defendants, they waited for the opportune time to dump their holdings to reap maximum return; and (iii) their actions made the resulting collapse inevitable because, among other reasons:

a. They raided the Community Treasury without a community vote;

b. They allowed ICHI to be used as collateral in Rari Pool 136;

c. They set the LTV ratio at an extremely high 85%; and

d. Secretly letting users lever up the contents of Angel Vaults would inevitably destabilize the very "stablecoins" that Angel Vaults purported to stabilize.

85. Crypto enthusiasts on Twitter immediately questioned Defendants' explanations, noting that their ICHI Platform had essentially been a bait-and-switch that had exposed their business model as a scam.[20]

---

[20] 20 Senpai of the Hentai (@DegenSpartan) TWITTER (Apr. 11, 2022), https://twitter.com/Degen Spartan/status/1513692501659766787; José Bidren (@smolPOTUS) TWITTER (Apr. 12, 2022), https://twitter.com/smolPOTUS/status/1513807393662152704; Tajer (@omolewaAbraham) TWITTER (Apr. 13, 2022), https://twitter.com/omolewaAbraham/status/1514215248714207246.

찌G跻じ ***Senpai*** of the ***Hentai***
@DegenSpartan

i feel the real innovation by ICHI x Fuse (by Rari)

is proving the business model of turning pool lenders into bagholders overnight

i wonder which other projects can also do a bait and switch of collateral



José Bidren
@smolPOTUS

Congrat to ichi team on successful 533 million dollar rug pull. Send half over to my friend @irs and we can forget about all the smol Amurekans u scam. God bless the big fish God bless amureca. $ichi $eth

4:13 AM · Apr 12, 2022 · Twitter for Android

Tajer ⚔️🦀
@omolewaAbraham

$ICHI don't worry guys its just a healthy rug pull

notEezzy 🧸 @notEezzy · Apr 13
ichi went from $140 to $13 (~92% down) and then went from $13 to $1.9 (another ~83% down)

let this be a reminder that your bags that are down 90% can still go down another 90% from there and even that can still go down another 90% from there 👍 twitter.com/0xDamien/statu...

7:13 AM · Apr 13, 2022 from Lagos, Nigeria · Twitter for Android

86. During a video conference with HASH that occurred on or around

April 15, 2022, Mr. Gross admitted that Defendants had transferred the contents of the Community Treasury to Rari Pool 136 without a vote. When asked for further details, including how HASH planned to satisfy its duties to its earliest investors, Gross acknowledged the need to help investors regain their lost cryptocurrency.

**E. Plaintiff's Investigation Exposes Defendants' Scheme**

87. By inspecting the history of various wallets responsible for the pump-and-dump scheme, Plaintiff linked the most active wallets involved in the borrowing to ICHI Foundation and DMA. Certain of those crypto tracing efforts and findings are explained in further detail in the attached declaration from the crypto tracing expert, which is expressly incorporated by reference. (*See* Sibenik Decl.)

88. There are certain smart contracts which are administrative in nature, such that only Defendants and their agents would interact with them. These are smart contracts that are critical to ensuring that a particular protocol works properly. One of those smart contracts is called the "ICHI Deployer." Plaintiff uncovered that some of the digital addresses that executed key transactions causing Rari Pool 136's collapse have previously interacted with the ICHI Deployer. Those prior interactions appear to be testing and other maintenance functions. These activities indicate that those digital addresses are attributable to

the Defendants and their agents.

89. One such wallet ("W1"), with the wallet address "0x4fe5f268e5053a0510 8ebaf13ebd9a825e6fb6f2," incurred over $5.6 million in unpaid trading debt. W1's transaction history shows that:

a. W1 interacted with a smart contract called the ICHI Deployer. This is an administrative smart contract. Only Defendants and their agents would have a need to participate with the ICHI Deployer.

b. W1 received cryptocurrency from the Treasury around the time that Defendants raided the Community Treasury.

c. W1 engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price.

d. W1 dumped more than $4 million in ICHI between March 27 and April 11, 2022, including several thousand tokens when the ICHI price was at its peak.

90. Another wallet ("W2"), with the address "0xc8b5c6363ad036883fc663766ec d87928ad3dc36," borrowed over $15 million in stablecoins. W2 also interacted with the ICHI Deployer smart contract way back in November 2020. W2 engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in

price.

91. A wallet ("W3") with the address "0x0dd4c0c16fff6693e169ef89235cb92f9d8 943ee" dumped $1.1 million in ICHI in mid-March 2022, as the ICHI price began to rise. W3 is associated with a screenname that matches the username of an ICHI Foundation employee ("IE1"), who serves as the company's Chief Technology Officer.

92. Like W2, a fourth wallet ("W4") with the address "0x2dddb6 a69f071313580073941a4491313303b1ab" interacted with the ICHI Deployer smart contract back in November 2020, again signaling control by a founding-era ICHI employee. W4 dumped approximately $3.3 million in ICHI crypto on April 9 and 10, 2022, but not before incurring approximately $812,000 in unpaid debts. W4 transacted with W2 and W3, which are themselves controlled by Defendants.

93. A fifth wallet ("W5") with the address "0xe4f4d41bd8da7ae7e638aeac9800e67fcd 8e2858" also received tokens from the ICHI Deployer smart contract. W5 engaged in borrowing USDC and withdrawing it into another account on April 11, 2022, as forced liquidations in Rari Pool 136 occurred. In the process, W5 netted nearly $1.6 million. It also incurred approximately $3.1 million in unpaid debt.

94. Yet another wallet ("W6") with the address "0xfb06ec3296ae0985f66a72c7efab5b 27618d0d00" incurred $12.2 million in

unpaid debt and was also involved in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price. W6 transferred some borrowed cryptocurrency to another wallet address, "0x82ceb7ce20e4c7531643ecf4b026caba5b9d3a05," which, upon information and belief, is associated with an ICHI Foundation employee ("IE2").

95. Finally, a wallet ("W7") with the address "0xd4154916d1330a7eab4bf3e21295295 805a1ab4f" also engaged in the leveraged borrowing transactions, or substantially similar transactions, in Rari Pool 136 that caused ICHI to increase in price. W7 incurred approximately $13.1 million in debt. W7 is associated with the screen name of an ICHI Foundation employee ("IE3"), who upon information and belief, is a business associate of IE2.

96. W6 and W7 borrowed stablecoins from Rari Pool 136 in a manner highly correlated with Defendants' unauthorized transfer of Treasury assets to Rari Pool 136 . In some instances, W6 and W7 borrowed stablecoin from Rari Pool 136 just minutes after Defendants had improperly moved those stablecoins out of the Treasury.

97. On information and belief, Bryan Gross, DMA, the ICHI Foundation, and Nick Poore knew about, encouraged, authorized, participated in, directed, accepted the benefits from, and/or otherwise ratified the conduct of IE1, IE2, IE3, and the owners of W1, W2, W4, and W5.

98. On information and belief, Defendants terminated the employment of several ICHI employees following the collapse of Rari Pool 136, including IE2 and IE3. On information and belief, Defendants terminated these employees to distance themselves from activities about which they knew, or which they encouraged, authorized, participated in, directed, accepted benefits from, or otherwise ratified.

## CAUSES OF ACTION

## COUNT I

Fraud

99. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

100. Defendants made the following false statements of material fact to Plaintiff:

a. Defendants said Plaintiff's crypto investments conferred community voting rights. In truth, Plaintiff had no such voting rights and Defendants maintained unilateral ability to control and dispose of the Treasury assets. Defendants raided Treasury assets without any community vote, transferring high quality crypto assets into Rari Pool 136, which they later removed through the pump and dump scheme. After the collapse of Rari Pool 136, Defendants revised the Offering Documents to state that the Treasury is "operated

by multi-signature wallets that are held by a collection of delegated community members and core team members." Upon information and belief, this was always the case, and Defendants updated these statements in their Offering Documents because prior statements were inaccurate and misleading.

b. Defendants said oneTokens could be redeemed for 1 USDC at any time. In truth, oneTokens were not true stablecoins and Defendants could block their redemption and destabilize them.

c. Defendants said oneTokens have no liquidation risk. In truth, Defendants' protocol forcibly liquidated investors' holdings to cure debts that others—including Defendants themselves—incurred in Rari Pool 136.

d. Defendants said oneTokens were "stablecoins." In truth, any stability was derived only from Defendants' securing Plaintiff's investments in the Community Treasury; keeping their word to leave assets in the Community Treasury; and permitting users to withdraw their holdings, all things Defendants stopped doing when it suited them.

e. Defendants said Angel Vaults would be available to guard against volatility and confer "stable assets . . . creating a reliable, everyday currency that can easily be used to pay for business operations and investing in DeFi."[21] In truth—and as ICHI subsequently updated its Offering Documents to

---

[21] Daniel Tal, *Angel Liquidity Vaults: Get Comfy this Crypto Winter*, MEDIUM

reflect—"Angel Vaults are highly risky as they allow for single-sided liquidity deposits, and use those to deposit to a liquidity pool."[22]

f. Defendants said the ICHI Foundation was a DAO and control over any of Defendants' products was decentralized. In truth, Defendants controlled ICHI, and the entire ICHI Platform was not a DAO but rather a traditional, centralized business. Consistent with this:

i. ICHI Foundation is not an unincorporated association but rather a business entity registered in the Cayman Islands.

ii. Bryan Gross's "Roadmap to $1B in Community Governed Value," involved a plan to "hire a larger, decentralized team for marketing, growth[,] and development." "[D]ecentralized team" is an oxymoron. A central authority is necessarily doing that hiring and marketing.

iii. Mr. Gross and his team controlled ICHI and Rari Pool 136. Defendants' promises of "decentralization" and "community governance" were lies; these "rights" were not guaranteed and Defendants would operate unilaterally instead of taking community votes.

iv. Defendants retained power to alter smart contracts at any

(Nov. 24, 2021), https://medium.com/ichifarm/angel-liquidity-vaults-uniswap-v3-supercharged-for-lps-and- crypto-projects-f15bc17b3946.

[22] *Angel Vault FAQs*, ICHI DOCS V3 (last visited Oct. 27, 2022), https://docs.ichi.org/ichi-docs- v3/resources/faqs; *see also Risks*, ICHI DOCS (last visited Oct. 27, 2022), https://docs.ichi.org/home/technical-resources/risks (same).

time.

v. Defendants could choose to discontinue oneTokens at any time.

g. Defendants represented on or around March 24, 2022, that (i) the ICHI crypto remained undervalued; (ii) the Angel Vault buy wall remained strong and could handle any selling; and (iii) Defendants would make necessary adjustments to the buy wall to ensure its continued viability even as the price of ICHI climbed. In fact, the ICHI Platform could not support any further increase in the price of ICHI, the buy wall was nearing the point of collapse, and Defendants did not intend to adjust (nor did they adjust) the buy wall to protect it.

101. These misrepresentations were material. Had Plaintiff known the truth, Hash never would have invested in the ICHI Platform.

102. Defendants made these statements intending to induce Plaintiff's reliance. Defendants knew the statements were false or misleading or were reckless about whether the statements were false or misleading.

103. Plaintiff reasonably relied on the truth of these statements.

104. As a direct and proximate result of this fraudulent conduct, Plaintiff suffered damages in an amount to be proven at trial.

## COUNT II

Selling unregistered securities – Section 12(a) of the Securities Act of 1933 (15 U.S.C. § 77*l*)

105. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

106. ICHI and the Rari 136 offering is a "security," because it involves an investment in a common enterprise with the expectation that profits or other gain will be produced by others' efforts, as demonstrated by the foregoing allegations.

107. Specifically, the Defendants offered "notes" to the Plaintiff, which should have been registered as securities.

108. Defendants used an instrument of communication in interstate commerce to do this, namely the internet, Telegram, Discord, and other forms of electronic communication.

109. No registration statement covering ICHI or Rari Pool 136 was in effect as required by Section 5 of the Securities Act (15 U.S.C. § 77e).

## COUNT III

**Market Manipulation – Section 9(a) & (f) of the Securities Exchange Act of 1934 (15 U.S.C. § 78i)**

110. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

111. Through the transactions herein, Defendants effected a series of

transactions raising the price of ICHI and depressing the price of oneTokens for purposes of inducing the purchase or sale of ICHI and oneTokens by others, in violation of Section 9(a)(2) of the Exchange Act.

112. Defendants did this through a means or instrumentality of interstate commerce, namely, the Internet.

113. As a factual and proximate result, Plaintiff suffered damages in an amount to be proven at trial. Defendants are liable for actual damages and reasonable costs and attorneys' fees, as authorized by § 78i(f).

**COUNT IV**

**Breach of Contract**

114. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

115. The Plaintiff is a party to a separate contract with Defendant, composed of Defendants' statements in the Offering Documents and in other public communications described in this Complaint regarding the terms of, and rights and obligations conferred by, an investment in the ICHI Platform.

116. Under the terms of that agreement, Defendants promised, among other things, to provide software that would allow oneTokens to be redeemed for precisely $1 USD each.

117. Defendants further promised that Plaintiff would have the right to

vote regarding the governance, use, and disposition of Community Treasury assets.

118. Defendants breached their contractual obligations to afford voting rights to Plaintiff by failing to call for votes when required and/or failing to respect the outcome of any such votes.

119. Defendants breached their contractual obligations to Plaintiff by failing to honor their redemption obligations.

120. As a result, Plaintiff has suffered damages equal to at least the amount of unredeemed oneTokens, plus consequential damages in an amount to be proven at trial.

**COUNT V**

**Conversion**

121. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

122. The cryptocurrency Plaintiff deposited into Defendants' ICHI Platform was Plaintiff's exclusive property.

123. Defendants interfered with this property interest and took this property by, without Plaintiff's consent or complying with community vote requirements, transferring Plaintiff's deposits out of the Treasury and into Rari Pool 136, siphoning the value of Plaintiff's investments via the pump-and-dump

scheme, and preventing Plaintiff from withdrawing their capital or redeeming their oneTokens.

124. As a factual and proximate result of this conduct, Plaintiff suffered damages in an amount to be proven at trial.

**COUNT VI**

**Breach of Fiduciary Duty**

125. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

126. Defendants were fiduciaries toward Plaintiff because their relationship was one in which Plaintiff put special trust in and reliance in Defendants and in Mr. Poore and Mr. Gross in particular. This is evident because:

a. Plaintiff entrusted its cryptocurrency to Defendants to deposit in Defendants' ICHI Platform with the expectation that Mr. Poore and Mr. Gross would act in Plaintiff's best interests;

b. Defendants enjoyed discretionary power over the operation of the ICHI Platform and the disposition of cryptocurrency deposited there;

c. An information asymmetry existed between Defendants and Plaintiff as to the operation and integrity of the ICHI Platform;

d. Bryan Gross's self-appointed title was the "Steward" of ICHI;

e. Bryan Gross has told Plaintiff that he can influence 20% of the

votes of governance tokens;

f. On information and belief, Mr. Gross was the only person who ever made proposals and called for investors to vote on the same; and

g. After Rari Pool 136 collapsed, the ICHI Foundation committed to "[r]estore trust for existing users,"[23] which presupposes that trust is needed for the project to function.

127. Defendants thus owed Plaintiff fiduciary duties of loyalty, care, and good faith to maximize value for Plaintiff and to elevate Plaintiff's interests above their own.

128. Defendants violated their duties of loyalty and good faith by engaging in self- dealing, namely:

a. Engaging in a pump-and-dump scheme at their investors' expense;

b. Locking Plaintiff's holdings to prevent withdrawal;

c. Transferring Treasury holdings without obtaining the required investor vote; and

d. After Rari Pool 136 collapsed, pursuing an action plan that involves once again trying to pump the price of ICHI, even

---

[23] ICHI, *The ICHI Action Plan*, MEDIUM (Apr. 15, 2022), https://medium.com/@ichidao/the-ichi- action-plan-4bac05b99f88.

though, upon information and belief, Defendants have sufficient funds to return their investors' capital.

129. Defendants violated their duties to act with due care and on an informed basis by:

a. Allowing the use of ICHI as borrowing collateral in Rari Pool 136;

b. Secretly letting users lever up the assets from the Treasury, which inevitably destabilized the "stablecoins" used in the protocol; and

c. Continuing to stock Rari Pool 136 with stablecoins even after the ICHI price surge.

d. This lack of due care is evident in Defendants' confession that "we did not consider the possibility of users leveraging ICHI to the extent that they did." [24]

130. As a factual and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff suffered damages in an amount to be proven at trial.

**COUNT VII**

**PIERCING THE VEIL AND ALTER EGO LIABILITY**

131. Plaintiff repeats and re-alleges each and every allegation in the

[24] ICHI, *ICHI – POOL #136 FAQS*, MEDIUM (Apr. 13, 2022), https://medium.com/@ichidao/ichi- pool-136-faqs-aa9ca59602f3.

preceding paragraphs as if fully set forth herein.

132. Defendants functioned as a single fraudulent enterprise which was used to perpetrate the fraudulent scheme orchestrated by Defendants Gross and Poore, through DMA, in Delaware.

133. Disregarding the corporate formalities and using DMA to commit the fraud, Defendants siphoned off DMA and Ichi funds to the detriment of the investors in their sham offering.

134. The Defendants' fraud and injustice requires piercing the corporate veil and imposing alter ego liability against each of them.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

135. Compensatory and punitive damages to the extent allowed by state and federal law, but in no event less than $16,203,735;

136. An award of attorneys' fees to the extent allowed by applicable law or contract;

137. An award of prejudgment interest; and

138. All such further relief as the Court determines that justice requires.

DATED: April 8, 2025

**WHITEFORD, TAYLOR &**
**PRESTON LLC**

*<u>/s/ Daniel A. Griffith</u>*
Daniel Griffith, Esq. (ID No. 4209)
600 N. King Street, Suite 300
Wilmington, Delaware 19801
(302) 357-3274
DGriffith@whitefordlaw.com

Of Counsel

**BENAUR LAW LLC**
George Benaur (GB1224)
43 W 43rd Street
New York, New York 10036
Phone: (609) 216-6105
Email: george@benaurlaw.com
(Pro Hac Vice Application Pending)

*Attorneys for Plaintiffs*

EFiled: Apr 08 2025 11:07AM EDT
Transaction ID 76013865
Case No. 2025-0374-

# EXHIBIT A

# TABLE OF CONTENTS


## CURRENCY FOR EVERY COMMUNITY

I. ICHI DAO
- A. Community Tenets
- B. ICHI Governance
  - 1. Process
  - 2. Beginner's Guide to Voting
- C. Where to Get ICHI
- D. Liquidity Programs
  - 1. Reward Allocation
  - 2. Halvings

II. EARN YIELD
- A. Deposit
- B. Farms
- C. Angel Vaults
  - 1. Angel Vault FAQs
- D. HODL Vaults
- E. Uniswap V3

III. DEVELOPERS
- A. Decentralized Monetary Authority (DMA)
  - 1. Minting
  - 2. Redemption
  - 3. Collateral Reserve
  - 4. Community Treasury
- B. Core Technical Concepts
  - 1. Governance
    - a) *Treasury Governance*
  - 2. Oracles
  - 3. Mint Masters
  - 4. Collateral Tokens
  - 5. Strategies
- C. Controller
- D. Contracts

IV. PARTNERS
- A. Grants
- B. Liquidity Providers

## V. AUDITS & RISKS

A. Audits

B. Risks

## VI. GLOSSARY

A. ICHI Concepts

B. oneToken Concepts

C. DeFi Concepts

## VII. FAQ

A. Frequently Asked Questions

# Currency for Every Community

ICHI deploys a branded dollar for any cryptocurrency community. This enables retail on-boarding, protocol growth, and ecosystem acceleration.

---

**Problem**

Every crypto project has three problems it seeks to solve:

1. Getting new users
2. Growing protocol value via token scarcity and value locked
3. Building an ecosystem of businesses supporting their protocol

**Solution**

ICHI aims to solve all three problems for protocols:

1. **New users**: The greatest obstacle for new protocol users is understanding a protocol's native token and its benefits. Branded Dollars are simple to understand and require users to buy the project's native token in order to mint them.
2. **Growing protocol value:** Branded Dollars are owned by the protocol that creates them and help lock in that project's native assets in a treasury that becomes Protocol Owned Liquidity (POL).
3. **Building an Ecosystem:** DeFi projects are companies with both business and operational needs. Branded Dollars allow these projects to pay for grants, bounties, workers, etc. These tokens remain stable and do not put pressure on the receiving parties to sell them for a more stable asset (as happens when they are paid in native tokens).

**ICHI** deploys a Decentralized Monetary Authority (**DMA**), a DAO customized **to give any community a branded dollar worth 1 USD.** The Branded Dollar that is created in the process is minted with a community's scarce crypto asset and is capital efficient.

Money functions as a medium of exchange, a unit of account, and a store of value. *It never made sense for one cryptocurrency community to rely on other communities to provide them with a medium of exchange and unit of account.* With ICHI, every cryptocurrency community can fully govern and benefit from their own stable currency.

## Join the Community Website | Telegram | Medium | Twitter | Discord | Snapshot

# Community Tenets

Core values of the ICHI community

**Tenets** are the fundamental values that underly every action, decision or move the **community** makes. The ICHI community believes:

1. **We exist to provide member communities with all the benefits of their own currency.**
2. **Voting power derived from ICHI governs ICHI.**
3. **Only the community of each individual project can govern the treasury backing its currency.**
4. **ICHI holders are incentivized to grow member communities.**

Any **community member** may propose a change to a **tenet.** After rigorous debate, the **community** may vote to change, add, or remove a **tenet**. Over time, we will learn better **tenets**.

Community members can participate in governance through Snapshot.

# ICHI Governance

Governing the ICHI DAO

---

**ICHI** is a DAO (Decentralized Autonomous Organization) governed by the community of ICHI token **stakers**.

Proposals on everything from halvings to partnerships are submitted to the community via Telegram and voting is done on Snapshot.

> ## Separation of Governance: ICHI Protocol vs. oneTokens
> **ICHI** is the governance token of the ichi.org community and platform. It is hard capped at 5M tokens. Each ICHI is a vote on halvings, partnership proposals, allowed oneToken components, oneToken community additions, etc**.** in exchange for protocol governance rewards.
> **oneTokens** are the governance tokens of each specific oneToken system. Learn more: oneToken Governance

**Staked ICHI (xICHI)**

Staking ICHI tokens gives stakers:

1. **ICHIpowah** to propose and vote on ICHI governance proposals to determine future features and/or parameters of the ICHI platform as well as protocol improvements, with voting weight calculated in proportion to the tokens staked (the right to vote is restricted solely to voting on features of the ICHI platform; the right to vote does not entitle ICHI holders to vote on the operation and management of any legal entity, their affiliates, or their assets or the disposition of such assets to token holders, and does not constitute any equity interest in any of these entities). The arrangement is not intended to be any form of joint venture or partnership.
2. **Rewards** for participating in governance proposals. It is the community members which would drive development of the ICHI platform, so token incentives would

need to be distributed to compensate them for their time, expertise and effort. Only users who have participated in submission of proposals, commenting, reviewing and/or voting will be entitled to receive ICHI token governance rewards.

Stake ICHI here by clicking the ICHI dropdown and selecting "Stake".




## ICHIpowah

In order to participate in ICHI governance, which includes proposing community initiatives and voting on others' proposals, you must have ICHIpowah. **ICHIpowah** is voting power within the ICHI community. It is calculated by the number of ICHI tokens staked. **xICHI** is minted when you stake ICHI.

## Participation Rewards

xICHI holders can be rewarded by oneToken treasuries by staking ICHI. oneToken treasuries pay 2% management fee and 20% performance reward directly to xICHI. There is no specified schedule for when payments are made out to xICHI so an APY will only be available in hindsight. The best way to avoid missing a payment is to keep your ICHI staked in xICHI.

Rewards to xICHI holders are announced via Telegram and can be found in the Week In Review (WIR) posts on ICHI's Medium.

# Process

How to create a proposal to enact changes within the ICHI community

Proposal submission and voting happen on ICHI's Snapshot. You can view previous proposals, see voting statistics, and vote on open proposals.

**Creating a Proposal**

## Phase 1

Create a Google Doc with detailed proposal including: idea, reasoning for proposal, how this will benefit the ICHI community, possible risks. Once created, post the Google Docs link (enabling comments by community members) to the ICHI Telegram and Discord groups in a message labelled "New Community Proposal: <Google Docs link>".

## Phase 2

Discuss with the ICHI community on Telegram and Discord to see if a presentation is needed on a community call. Community calls are an open forum to present and discuss proposals.

## Phase 3

Once approved post your proposal will be posted by one of the ICHI Core team members to ICHI's Snapshot for a vote.

# Beginner's Guide to Voting

Voting for ICHI proposals

---

Members of the ICHI community who have staked their ICHI in xICHI and/or provided Liquidity to ICHI Liquidity Pools are eligible to vote on proposals. Stakers and LPs must have their tokens locked in to xICHI or the liquidity pool in an Ethereum block prior the opening of a proposal's voting period.

Stake ICHI here
View ICHI Pools here

Once ICHI is staked in xICHI

1.Navigate to ICHI's Snapshot
2.Select the open proposal you wish to vote on
3.Select "Connect wallet"




4.Choose one of the approved Snapshot wallets that you store your xICHI in




Wallets supported by Snapshot

5.Once connected, you will be able to vote from the available options at the bottom of the proposal

*You can change your vote as many times as you wish until the the voting period closes.

# Where to Get ICHI

Buying and earning ICHI

**ICHI** can be:

1. Bought directly on multiple Exchanges
2. Earned through providing services that benefit the entire ecosystem, for example providing liquidity on AMMs / farming on app.ichi.org - Learn more on earning ICHI rewards: ICHI Farms

Current Exchanges that provide opportunities to buy ICHI:

| Exchanges |
| --- |
| **DEXes** |
| SushiSwap |
| Balancer |
| Uniswap V2 |
| Bancor |
| 1inch |
| Loopring (Layer-2) |

*Listing proposals may be submitted by an ICHI community member at any time and voted on by the ICHI community.

# Liquidity Programs

Earn Rewards for providing Liquidity

---

You may earn a share of ICHI governance token rewards for staking LP tokens received from providing liquidity to ICHI or depositing oneTokens. Every ICHI token in circulation has been distributed through ICHI's liquidity farming contract. ICHI tokens are distributed every Ethereum mainnet block and are split 50-50 across two types of pools that are eligible for ICHI liquidity rewards:

1. **oneTokens:** ICHI rewards are distributed to oneToken depositors in order to encourage community members to provide liquidity and active governance of specific stablecoins.
2. **ICHI pools:** In order to promote the ICHI platform to a wider audience and for it to function properly, users would need to be incentivized to play the role of liquidity providers and stake their digital assets into the decentralized AMM pools to provide the necessary liquidity for transactions. As compensation for opportunity costs, these liquidity providers which help to promote adoption of the ICHI platform by staking or including assets to liquidity pools in exchange for LP tokens would be rewarded with ICHI tokens, according to each user's relative contribution after various adjustment and correction parameters.

Click here to view the active oneToken and ICHI pools.

Click here to view active ICHI.org farms and a step-by-step guide to farming.

Reward Allocations and Halvings change the amount of ICHI rewards that can be earned.

# Reward Allocation

ICHI rewards are allocated between pools based on proportional non-ICHI liquidity and proportional minted oneTokens.

---

ICHI rewards are distributed every Ethereum mainnet block and are split between oneToken depositors and ICHI Pools.

## Reward Allocation for oneToken (Stablecoin) Pools

50% of ICHI rewards go to stablecoin pools. These rewards are allocated based on proportion of minted oneTokens.

## Reward Allocation for ICHI pools

50% of ICHI rewards go to ICHI liquidity pools. These rewards are allocated based on proportional non-ICHI liquidity contributed to the pool.

## Schedule of Changes

Here is the process of making changes in rewards:

1. **Initial Eligibility:** when a compatible pool contains $20k of non-ICHI liquidity or $20k in ICHI stablecoins it is eligible for rewards and will be allocated the minimum amount possible.
2. **Reward Adjustment Process:** A measurement week runs from Monday to Sunday. Every Monday, a new reward schedule (based on the previous measurement week) will be posted with the changes scheduled to go live 48 hours later.

   > ⓘ Reward adjustments are are posted on Mondays in the Week In Review (WIR) posts on Medium.

**Downside Protection:** A specific pool's reward rate may only adjust down a max of 5% at a time. For example, if the reward rate is 0.2 ICHI per block, the new reward rate may

not be lower than 0.19 ICHI per block. **Scheduled halving events or other community votes are exceptions to this rule.*

# Halvings

ICHI Liquidity Rewards are periodically cut in half based on community votes

The only way ICHI tokens are brought into circulation is through Liquidity Rewards. Halvings are events in which ICHI Liquidity Rewards are cut in half. These events happen periodically and are scheduled by community vote.

The current distribution rate of ICHI to ICHI Liquidity Rewards is 0.25 ICHI per Ethereum Block. This will halve to 0.125 ICHI per block after the next halving. **You must claim your ICHI rewards before halving to receive the pre-halving level of rewards.**

## Why Halvings

A halving is a way to distribute the dwindling supply of ICHI without ceasing liquidity rewards. The theory of halving works like this: the liquidity reward is halved → half the inflation → lower available supply → higher demand → higher price → liquidity incentive still remains, regardless of smaller rewards, as the value of ICHI is increased in the process.

It is important that the ICHI community agrees on the timing of halvings. ICHI voters who stake ICHI may prefer to halve the reward schedule sooner. ICHI voters who are providing liquidity may prefer to wait longer before halving the reward schedule. By holding a token-weighted vote, every single ICHI that is staked or used as liquidity is able to influence the outcome.

The ICHI community may schedule a halving vote at any time. However, they are typically scheduled about 2-4 weeks after a halving. This gives the ICHI community time to observe the effects of halving and make an informed decision.

## Previous Halvings

| Date | Ethereum Block | New Liquidity Reward Rate (per block) |
|---|---|---|

| | | |
|---|---|---|
| May 8, 2021 | 12394000 | 0.25 |
| February 22, 2021 | 11908500 | 0.5 |

## Pools Unaffected by Halvings

A pool-specific reward schedule may be passed by the community. For example, the oneWING-USDC pool received 0.2 ICHI per block for 500k blocks as part of an agreement with wing.finance. This, or similar proposals, may cause a pool to be unaffected by a specific halving.

# Deposit

Users are able to deposit Branded Dollars to the ICHI rewards contract and begin earning ICHI rewards in a single step Deposit.

---

Branded Dollar Deposits are a simple way for Branded Dollar holders to earn ICHI rewards for HODLing their stable assets.

Any Branded Dollar appearing on the Deposits page can be deposited directly to an ICHI-built farming contract to begin earning ICHI rewards.

Users are able to deposit from the ICHI application in a single step without needing to generate or manage LP.

Depositing Branded Dollars

1. Get Branded Dollars either through Minting or by purchasing them on Uniswap v3.
2. Go to the Deposit page and click "Deposit" on your Branded Dollar of choice.
3. Once on the Branded Dollar page, click "Deposit".



4. Add amount, approve, and deposit.




Deposit oneTokens here

# Farms

ICHI Enables oneToken and ICHI Liquidity Pool Providers an opportunity to farm their LP and earn ICHI rewards

In the words of Masanobu Fukuoka, "The ultimate goal of farming is not the growing of crops, but the cultivation and perfection of human beings." With this in mind, we at ICHI have enabled the ability for our community members to provide liquidity to Liquidity Pools across multiple DEXes in the DeFi ecosystem and use their LP tokens to earn ICHI rewards through yield farming. Below are the different farms available. To see APYs check out ICHI's Farms.

**Active ICHI Farms**

| Farm | Liquidity Pool | Description |
|---|---|---|
| ICHI-ETH | ICHI-ETH (Sushi) | ICHI-ETH Pool on SushiSwap |
| ICHI-1INCH* | ICHI-1INCH (1inch) | ICHI-1INCH Pool (both pool and farm on 1inch) |
| 80/20 ICHI-ETH | ICHI-ETH (Balancer) | Balancer Smart Pool that includes 80% ICHI and 20% ETH |
| ICHI-BNT | ICHI-BNT (Bancor) | ICHI-BNT Pool on Bancor - single-sided ICHI deposits available |
| ICHI-ETH | ICHI-ETH (Uniswap) | ICHI-ETH Pool on UniSwap |

*Reward schedules based on partnership contracts

Step-by-step Farming Guide

Follow these steps to select a farm and start earning ICHI rewards.

1. Go to https://app.ichi.org/farm

2. Select a farm and click the green "Farm/Earn" button. Generally, the farms with higher yields are more risky than the farms with lower yields. Please review the risks section for more details.

| Farm | Coins | ROI | Liquidity | Staked | Earnings | |
|---|---|---|---|---|---|---|
| ICHI-ETH | ICHI<br>wETH | 32.67%<br>2.69% (1m)<br>0.09% (1d) | $2,299,094<br>369,829 ICHI<br>587 wETH | $1,699,267 | 0<br>Claim | Farm |
| ICHI-BNT | BNT<br>ICHI | 45.46%<br>3.74% (1m)<br>0.87% (1w) | $2,249,769<br>373,969 BNT<br>360,339 ICHI | $1,127,861 | *Updates Coming Soon* | Earn |
| ICHI-1inch | 1INCH<br>ICHI | 104.16%<br>8.56% (1m)<br>0.29% (1d) | $1,493,695 | $1,280,810 | | 1INCH |
| 80/20 ICHI-ETH | ICHI<br>wETH | 26.11%<br>2.15% (1m)<br>0.07% (1d) | $237,719<br>61,023 ICHI<br>24 wETH | $237,718 | 7.12<br>Claim | Farm |
| ICHI-ETH | ICHI<br>wETH | 29.70%<br>2.44% (1m)<br>0.08% (1d) | $44,849<br>7,282 ICHI<br>11 wETH | $37,567 | 0<br>Claim | Farm |

3. There are 3 main actions on a Farm page. They must be done in order to farm:

- Trade - acquire the assets you need to participate in the farm (typically with ETH)
- Add Liquidity - Add the assets to the liquidity pool of choice
- Deposit the LP tokens - Deposit the LP tokens to the farm


ICHI-ETH
(sushi)
Your Deposits
LP
$0.00
0
ICHI
$0.00
0
wETH
$0.00
0
Your Harvest
ICHI
$0.00
0.00
Available LP
$0.00
0 SLP ICHI-ETH
Add Liquidity
Deposit
Withdraw

# Angel Vaults

A Uniswap v3 liquidity management protocol allowing single-sided asset deposits. Created for projects to build a treasury of project owned liquidity and LPs to not need to manage their Uni v3 position

---

ICHI Angel Vaults combine the rewarding and simple experience of Uniswap V2 with the concentrated liquidity of Uniswap V3. This means that liquidity providers earn more fees without having to actively manage the price ranges of their positions. In addition to providing liquidity providers the opportunity to earn higher trading fees, Angel Vaults also provide a number of features that benefit the projects that establish them, including:

- **Buy Liquidity**: providing single asset liquidity underneath the price of a participating project's token increases the price of that token.
- **Deflationary Liquidity Rewards**: By creating branded dollars through ICHI and then establishing an Angel Vault with that branded dollar, crypto projects can offset the cost of liquidity rewards. This is due to the upward price pressure created from locking the community's scarce token when minting its branded dollar and then using it as the single asset deposited in the Angel Vault.
- **Protocol Owned Liquidity (POL)**: depositing a portion of the assets backing that project's branded dollar into the Angel Vault creates sustainable, long-lasting liquidity.

| Feature | Uniswap V2 | Uniswap V3 | Angel Vault | Angel Vault + Branded Dollar |
|---|---|---|---|---|
| Fungible Liquidity Token | ✓ | ✗ | ✓ | ✓ |
| Concentrated Liquidity | ✗ | ✓ | ✓ | ✓ |
| Buy Liquidity | ✗ | ✗ | ✓ | ✓ |
| Non-Inflationary Rewards | ✗ | ✗ | ✗ | ✓ |
| Protocol Owned Liquidity | ✗ | ✗ | ✗ | ✓ |

The combination of an Angel Vault + a Branded Dollar provides benefits that outweigh those provided to projects and LPs using Uniswap alone.

ICHI's Angel Vaults are the easiest and most cost effective way for projects to increase their liquidity floor, enabling:

- LPs to earn more trading fees with less,
- Liquidity rewards to increase the amount of buy side liquidity without also incentivizing sell pressure,
- The inflationary cost of rewards to be offset by the deflationary minting of the project's branded dollar, and
- Protocols to build assets under management (AUM) backing their branded dollar.

# Angel Vault FAQs

Learn more about ICHI's Angel Vaults

## What is an Angel Vault?

An Angel Liquidity Vault is a Uniswap v3 liquidity management tool that helps protect a project's token price during market dips.

- *Angel Liquidity Vaults build treasuries of Protocol-Owned Liquidity*
- *Angel Liquidity Vaults allow crypto projects and DeFi users to earn better fees without having to manage their concentrated pool positions*
- *Angel Liquidity Vaults add purchase liquidity to the buy-side of an asset which allows for price protection and generates high income.*

## How do Angel Vaults work?

Angel Vaults use Uniswap v3 concentrated liquidity to establish a wall of liquidity directly under the price of a project's token. As the Angel Vault rebalances, a new price floor is established which protects a project's token against a market downturn. It is recommended that a project establishes at least a 15% Angel Vault Deposit to Market Cap ratio to successfully maintain price protection.

## Why would a project want an Angel Vault?

They protect your token price and earn revenue!

When an asset has a majority of its liquidity paired with Ethereum, the token becomes exposed to both the upside and downside of $ETH market volatility. With an Angel Vault, projects are decorrelated from ETH during market downturns. Since the deployment of ICHI's Angel Vault, the $ICHI price has been supported during a downturn, while still being able to enjoy market upside.

## What is the ROI Indicator on the ICHI App and how is it calculated?

ROI is calculated by adding up two factors (1) Vault IRR and (2) Rewards. Vault IRR displays the Uniswap v3 fees generated based on the historical performance of the Vault. (IRR is not a perfect representation of future earnings but stands to illustrate what is likely/has been the case until the current date). Rewards are based on ICHI's weekly reward emissions.

## Where can I find the oneUNI<>ICHI pool on Uniswap v3?

https://info.uniswap.org/#/pools/0x6dedf50966dbef7c5dec3607debe118f28b6bf33

## How many types of tokens are deposited into a Vault?

Only the Deposit Token! Angel Vaults take single-sided deposits (usually of a Branded Dollar) which we call the deposit token. The vault uses the deposit token to provide price protection for the other token in the pool known as the paired token.

## How is initial liquidity supplied to the pool?

The Angel Vault uses a Uniswap v3 pool that is made up of the deposit token and the paired token. To start the pool, an initial amount of liquidity is deposited at the creation of the pool and spread across the entire range.

## How often do rebalances happen? Are they automated?

Currently rebalances happen about once a week. They are monitored by automated software but manually pinged. This will be a fully automated process in the coming months.

## Who rebalances the vault?

At the moment, ICHI governance has been rebalancing vaults for partner projects due to the complexity. In the future, this will be up to the partner project. Partners who choose to rebalance can earn 10% of trading fees to pay for gas and other expenses. Otherwise, they can choose to have ICHI manage the position.

## Are Angel Vaults profitable without rewards?

This is dependent on many different factors (ex. Volume, number of rebalances, liquidity). The ICHI UI displays IRR (also known as the univ3 fees earned from trades routed through the vault's liquidity in the pool) for projects that have over 5% of market cap liquidity in their vault.

## What are the benefits of using a Branded Dollar in an Angel Vault vs. USDC?

- Branded Dollars offset liquidity rewards provided for Angel Vaults
- Converts TVL into POL through the usage of Treasury funds
- For every $1 of liquidity added to the vault, $1.20-1.50 of value is locked for the protocol (due to over-collateralization)
- Branded Dollar DMA technology provides a project with its own over-collateralized stable asset. This collateral can be managed and put to work across DeFi.

# HODL Vaults

A Uniswap v3 liquidity management protocol enabling users to deposit and accumulate more of their favorite project's tokens.

HODL Vaults are a Uniswap v3 liquidity management protocol that allow projects to create single-sided liquidity pools with their native tokens. Projects and DeFi users can deposit a crypto asset and earn more of their deposited asset as the pool generates trading fees and the price of $ICHI increases.

DeFi users benefit by being able to provide liquidity of their favorite tokens while earning high yields thanks to Uniswap v3's concentrated liquidity. Pool positions are automatically managed by ICHI so users do not have to worry about extra gas fees or spending time actively managing their positions on Uniswap.

Deposit to HODL Vaults here

## FAQ

1. **What is the *IRR* Indicator on the ICHI App and how is it calculated?**
   A: IRR refers to the returns from the Vault liquidity. Vault IRR displays the past performance (since its inception) of the Vault which illustrates the returns made from Uniswap v3 fees earned and liquidity growth. Due to the fact that it takes into account the past performance of the vault, it is not a perfect representation of future earnings but stands to illustrate what is likely/has been the case until the current date.

# Uniswap V3

Leveraging Uniswap V3 for efficient liquidity provision

ICHI oneTokens will dedicate a portion of their treasuries to provide liquidity on Uniswap V3 instead of just relying on individual liquidity providers (LPs). This Uniswap V3 position will be maintained via DMA helper contracts. This will enable larger trades and a tighter peg to $1 than current approaches because Uniswap V3 stablecoin pairs are efficient at facilitating a large volume of transactions with a low amount of total value locked (TVL).

# Decentralized Monetary Authority (DMA)

Decentralized management of currency for any community

**oneTokens** are ICHI designed stablecoins built for cryptocurrency communities. oneTokens keep their value at $1, are purely on-chain, and are supported by a community treasury in each oneToken's native project tokens. They provide the hard peg of centralized stablecoins without sacrificing on decentralization.

ICHI enables any community to deploy a project **Decentralized Monetary Authority (DMA)** to manage their oneToken.

**Table 1: Feature Comparison by Category of Stablecoin**

| Feature | Algorithmic | Fiat Backed | Crypto Backed | ICHI Stablecoins |
|---|---|---|---|---|
| Mint for Exactly $1 | No | Yes | No | **Yes** |
| Redeem for Exactly $1 | No | Yes | No | **Yes** |
| 100% On-Chain Reserves | Yes | No | Yes | **Yes** |
| Community Treasury | No | No | No | **Yes** |
| Liquidation Risk | No | No | Yes | **No** |

How it works




The DMA Model

### DMA Benefits

## Capital Efficient

While other stablecoins insist that a minter take out a debt position or over collateralize their position 2X or more, ICHI's oneTokens do not. oneTokens enable minters to deposit exactly 1 USD of value into the minter and receive 1 USD in value back. This is never a debt position and does not pose the risk of being liquidated.

## Decentralized

While being stablecoins, oneTokens provide an additional benefit to holders. They provide holders voting power over the project Community Treasury which holds the scarce crypto assets and can be strategically deployed based on community governance.

## Growth Enabling

Existing stablecoins remove value from cryptocurrencies that have to be sold to mint coins (much like selling a stock decreases the value of that stock). ICHI solves this problem and provides the benefits of fiat coins like USDC and USDT without the trade-offs. This is done through minting stablecoins in two parts: 1-part USD hard pegged stablecoin, 1-part community scarce crypto (project token). The scarce crypto is then locked in a Community Treasury, removing it from circulation and applying upward price pressure on the asset.

## 100% on-chain

Being 100% on-chain, oneTokens provides **transparency** that other stablecoins do not. This means anyone can see the USDC collateral and the coins paid to mint oneTokens on the Ethereum blockchain. Additionally, the entire transaction history of minting, redeeming, and any treasury actions are visible. If the coins or USDC are used by the coin's community to create DeFi (decentralized finance) positions, anyone interested is able to see these transactions and positions in the corresponding smart contracts.

# Minting

Mint stablecoins for exactly $1 of value per stablecoin by sending project tokens and USDC.

---

oneTokens are minted by you with your non-hosted Ethereum wallet through the DMA. There is no issuing entity, bank, or any other counterparty. You pay exactly $1 of value in two parts to mint a oneToken:

1. A USD hard pegged stablecoin deposited to the oneToken's Collateral Reserve
2. The oneToken's native project tokens (ie, wBTC) which is deposited to a Community Treasury

A **minting ratio** specifies how much USD hard pegged stablecoin and how much of the oneToken's cryptocurrency you pay to mint a oneToken. For example, you pay $0.90 USDC and $0.10 wBTC to mint oneBTC (the stablecoin for Bitcoin) at a 90% minting ratio.

Follow these steps to mint ICHI stablecoins

1. Head over to https://app.ichi.org/
2. Connect your Ethereum Wallet by clicking the "Connect Wallet" button on the top right of the page. If you are new to Ethereum, go here to learn about Ethereum wallets: https://ethereum.org/en/wallets/



3. Once your wallet is connected, click the "Mint" button on the left-hand side of the page



4. Once on the Mint page, make sure the "Mint" tab is selected




4. Select a stablecoin to mint



5. Enter an amount to mint.




6. Click "Approve" to approve the scarce crypto you plan to deposit in conjunction with USDC for minting (you will only do this on your first time minting a specific stablecoin)




7. Sign the transaction in your Ethereum wallet.
8. Click Mint to send the transaction to your Ethereum wallet




9. Again, sign the transaction in your Ethereum wallet.

# Redemption

Redeem oneTokens for exactly $1

Each oneToken (ie, oneBTC) can be redeemed for exactly 1 USDC (or other USD hard pegged stablecoin in the Collateral Reserve), less a redemption fee. A oneToken redemption can only come from the Collateral Reserve. The cryptocurrency paid to mint isn't repaid to any token holder by the system. Instead, it remains in a Community Treasury and each oneToken is a vote in deciding how to manage the community treasury.

Follow these steps to redeem ICHI stablecoins

1.Go to https://ichi.farm/#/mint to see the Minter in Figure 1.




2. Connect your Ethereum Wallet. If you are new to Ethereum, go here to learn about Ethereum wallets: https://ethereum.org/en/wallets/

3. Click Redeem




4. Choose a stablecoin to redeem




5. Enter an amount to redeem




6. Click Redeem to Redeem to USDC
7. Sign the transaction in your Ethereum wallet

# Collateral Reserve

oneToken's USD hard pegged stablecoin Collateral Reserve

There are two types of reserves backing an ICHI stablecoin: the USD hard pegged stablecoin known as collateral stored in **Collateral Reserve** and the native project tokens stored in the community treasury. Each of these reserve assets are visible on-chain and managed via the DMA.

## Collateral Reserve

1. Contains only stablecoins
2. May be deployed in various principal protecting strategies
3. Can be managed via Community Governance

ⓘ Upon redemption of a oneToken, you may claim $1 of collateral reserves while supplies last. oneTokens can accept multiple stablecoins for Collateral. Therefore, the amount of each stablecoin is an upper limit of how much can be redeemed of that specific stablecoin. E.g. If the contract accepts USDC or USDT as Collateral then the user may be forced to accept multiple stablecoins when redeeming if their oneToken holdings are larger than the Collateral of a single stablecoin.

# Community Treasury

Native project token backed community Treasury

When minting a oneToken, you pay $1 in value in a mixture of USD hard pegged stablecoin and the oneToken's specific native project token. The native project tokens remain in a **Community Treasury** because redeeming oneTokens will only return stablecoins from the Collateral Reserve. The oneToken community (oneToken holders) decides what to do with this treasury by voting with the stablecoin itself. Each stablecoin held represents a vote that decides what actions to take with the cryptocurrency paid to mint stablecoins. Proposals may include the following actions:

- Selling coins to buy more USDC and deposit it to the collateral
- Allocating the coins in DeFi (decentralized finance) contracts and receiving yield
- Paying adoption incentives for users to spend or save the stablecoin
- Paying grants to build applications and systems that support the stablecoin

This is not an exhaustive list. The community may propose and vote on any proposal.

> Go to https://app.ichi.org/treasury to view the current treasuries and collateral reserves for each stablecoin.

## Treasury Reserve Ratio

The Treasury Reserve Ratio shows how 'over-collateralized' a oneToken is. This happens when the dollar amount of the sum of the USDC collateral and the community treasury is more than the number of circulating stablecoins. The possible drivers of over-collateralization may include the following:

- Minting and/or redemption fees stay in USDC reserves.
- Coins paid to mint are not paid back when you redeem and may grow in value.
- Anyone can send coins into the community treasury.
- Anyone can send USDC into the USDC reserves, including the community treasury.

- USDC reserves and/or coins may be deployed by that in yield-bearing third party DeFi positions by that oneToken project community.
- The stablecoin may be minted with a yield bearing coin.

This is not an exhaustive list and the implementation of some (or all) of these drivers is determined by coin's community.

## Treasury Positions

A oneToken's treasury can be used on any proposal passed by the holders of that oneToken and in capital deployment strategies built by and voted for by the oneToken community. An example of actions a oneToken community could take to build their Community Treasury:

1. Contribute liquidity to ICHI stablecoin pools, receive ICHI rewards,
2. Pair ICHI with treasury asset, provide to ICHI liquidity pools, receive more ICHI rewards,
3. Re-allocate to other protocols and in systems to drive adoption,
4. Provide better interest when saving, increasing oneToken adoption, and
5. Provide discounts when spending, increasing oneToken adoption

These strategies can be used to solve the pains of specific crypto projects. An example is wing.finance's reason for wanting a oneToken and their use of oneWING to within their protocol to drive adoption.

# Core Technical Concepts

Technical overview of a Decentralized Monetary Authority

This section will discuss the technical building blocks of Decentralized Monetary Authorities including their modular design, architectural components (which can be customized for each oneToken community) that enable the system to function, and the inheritance map of the oneToken interface. The code for ICHI and oneTokens is open-source and can be found by going to ICHI's GitHub page.

**Modularity**

A key principle of ICHI’s architectural design is Modularity. The ICHI platform allows for components to be modular (similar to a microservices architecture) in order to allow for simplified and safe updates/upgrades when certain logic within contracts need to be changed. Additionally, the platform has certain components that are meant to be permanent, yet can be upgraded through a Proxy process. This allows ICHI to be simple and safe to upgrade as well as customizable (as it pertains to oneToken implementations). It increases separation of concerns, enables code reuse, and gives clarity into which jurisdiction applies to each guarded function.

Architectural Components

| Component | Function |
|---|---|
| ICHI Governance | Global governance controls the oneTokenFactory and manages global parameters. Governance itself is external to the oneToken system. |
| oneToken Factory | A contract that acts as a oneToken deployment mechanism. Global (ICHI) state information is stored and managed in this system-wide hub. |
| oneToken Governance | Governance of specific oneToken instances with user votes weighted by their holdings of the corresponding oneTokens in specific liquidity pools. |

| | |
|---|---|
| | oneTokenGovernance can replace oneToken modules or upgrade the core contract using the Proxy pattern. |
| Proxy Upgrade System | A system for upgrading smart contracts. It includes an Owner, Proxy Admin, and Proxy. |
| oneToken Vault | The core upgradeable (through a Proxy upgrade) contract owned by oneToken Governance that holds assets, mints and burns ERC20 tokens, and controls the process flow during the minting and redemption process, including coordinating modularized components. |
| Versions | oneToken Vault implementations that are published by deployers and admitted to the network by ICHI Governance. oneToken Governance can optionally adopt (upgrade, downgrade) an approved version of the oneTokenVault. |
| Oracles | Price feed modules that report the value of assets in the oneToken Vault through a normalized interface. The oneToken Vault passes Oracle price conclusions and volatility signals to Mint Master modules. |
| MintMaster | A Mint Master uses any available information to compute the current minting ratio. The Minting Ratio adjusts over time to maintain the exchange rate peg of a oneToken to 1 USD. The interface includes a maximum transaction volume figure (can be infinite) to accommodate anticipated future logic requirements. Since the rate can be up to 100% and the maximum volume can be as low as zero, the Mint Master can be a circuit-breaker if so desired. Oracles report volatility. MintMasters decide what to do. |
| Collateral Tokens | 0-n stablecoins that are accepted in tandem with Member Tokens at the Minting Ratio, by the oneToken Vaults. Upon redemption of oneTokens, oneToken Vaults burn the oneTokens in return for stablecoins of equal value (Collateral Tokens). Since more than one kind of |

| | |
|---|---|
| | stablecoin can exist in the oneToken Vault at any given time, multiple stablecoin options can be given upon redemption. While there will likely be sufficient Collateral to back all outstanding oneTokens, each specific stablecoin is redeemable on a "while supplies last" basis. |
| Strategies | Trading contracts that invest funds in yield-farming contracts, receive other types of tokens and report balances of each type of token they hold. A Strategy interfaces with a oneToken contract through the Controller. The interface to the Controller defines the minimum viable requirements to be a compatible contract. Strategies will be admitted via the ICHI Governance and selected by oneToken Governance. |
| Controller | A global contract that executes the appointed strategies for a given oneToken Vault at the specified period of time. The Controller also implements system-wide invariants such as enforcing conservation of value or allowable fees/slippage rules. |

The figure below provides a view of how each of the components in the oneToken system are deployed and what contract owns/admits each component.




oneToken Component Interaction

Inheritance Map

ICHI and the oneToken Factory were designed with Replaceable Modules to allow for flexibility and customization. With this in mind, we created the system to abide by a structured inheritance tree that contains specific interfaces. These interfaces provide guidelines and structure for each upgradable component in the system and ensure that once approved, these components are standardized for simple plug and play capabilities. The figure below shows the overall inheritance map of the ICHI and oneToken systems with each shape representing a Solidity contract that is either an Interface or an implementation contract.




Inheritance Map of original implementation of the oneToken Factory

## ⓘ Color Key:

**Blue Squares: Interface**
**Green Oval: Abstract**
**Red Oval: Contract**

# Governance

oneToken Governance, technical overview

---

Within the ICHI system we divide governance into two sections based on scope of authority. Both sections rely on the same voting code (in separate instances) that enables voting rights based on tokens staked. The sections are divided into:

1. Global (ICHI) Governance
2. Local/Instance (oneToken) Governance

**ICHI Governance**

ICHI Governance is the system's overall governance which we refer to as "global". It is the highest level of authority and thus has the largest scope. It provides boundaries inside of which the oneToken Governance instances can function to govern their oneToken community-backed Collateral and Treasury. ICHI Governance is responsible for admission control as it pertains to:

1. Accepting the creation of a new oneToken species, its initial configuration and its corresponding Community Governance contract.
2. Adding a new Collateral Token to the list of "like kind" Collateral Tokens available in the Collateral Reserve for oneToken holders.
3. Adding and removing implementation versions.
4. Adding Oracle, MintMaster, Controller, and Strategy implementations.

## Key components include

1. **Versions:** oneToken implementations.
2. **Oracles:** Price aggregators for each token in the Community Treasury and Collateral.
3. **MintMaster:** sets the Minting Ratio.
4. **Collateral Tokens:** USD hard pegged stablecoins accepted and emitted in the Minting and Redemption processes.
5. **Strategies:** Modular contracts purpose-built for deploying Collateral and Community Treasury funds.

## Deployments

ICHI Governance also deploys oneToken implementations. It does so by specifying an initial configuration from the available predetermined options. This is done through the following steps:

1. ICHI Governance includes the initial oneToken configuration and instructs the oneToken Factory to deploy a new oneToken contract.
2. The oneToken Factory (owned by the ICHI Governance contract) validates the input including confirmation that only a pre-approved implementation Version, Oracles and Collateral are specified.
3. The oneToken factory deploys the oneToken instance and the system of contracts is ready for service.




Components used in deploying oneTokens

### oneToken Governance

oneToken Governance is akin to local or community governance. Each oneToken instance has its own community-led governance with the ability to decide on customized implementations of system components that are whitelisted by ICHI Governance. oneToken Governance is implemented as an address which can be an EOA (Externally Owner Account), multisig, or on-chain governance contract capable of emitting bytecode. Important issues that oneToken governance deals with include:

1. Adjusting the Minting Minimum/Maximum or absolute Ratio for new minted oneTokens when using the Incremental implementation of the MintMaster, or working with other parameters chosen modules require.
2. Adjusting the type of Collateral used, e.g. change USDC to DAI or a combination of both.
3. Executing Community Treasury operations

> ⓘ Each oneToken is a vote on treasury allocations, specific stablecoins parameters (like minting and redeeming fees), and on adoption programs.

# Treasury Governance

Management of oneToken Treasuries

Managing the oneToken Treasury is a unique capability ICHI provides for its oneToken users. oneToken Governance can manage funds for both Collateral Reserve and the Community Treasury. This can be enabled for any oneToken community. Treasury management operations include:

1. Exchanging one type of token in the Community Treasury for another
2. Allocating project tokens in the Community Treasury in Staking and Farming operations
3. Allocating project tokens and other non-collateral assets across a variety of whitelisted DeFi opportunities
4. Allocating Collateral Assets in principle preserving, whitelisted opportunities across DeFi

This is flexible. In essence, this means that the oneToken Vault (holding both the Collateral Reserve and the Community Treasury) can do almost anything an EOA can do. By extension, that means participation in any third party DeFi protocols is completely possible as oneToken Governance sees fit from time to time. These actions can be automated through the implementation of Strategies.

# Oracles

oneToken price feeds

---

Oracles are price feed modules that report the value of assets in the oneToken Vault through a normalized interface. In the ICHI and oneToken system, Oracles are used for providing price feeds for project tokens, Collateral Tokens, and oneTokens. Price Oracles are vital to the correct operation of the system and are chosen based on preference for price feed source, interpretation (e.g. smoothing), and volatility-detection logic.

oneToken Oracles are structured in a reusable fashion. As Replaceable Modules, we expect Oracles to evolve and be customized towards the oneTokens they will be used for so the system assumes nothing about the operation of the Oracle itself. Instead, we define a normalized interface so that new implementations can be wrapped and used to report back the results of inspecting external sources. The figure below shows how the Oracle inheritance is structured. This enables flexibility and customization yet keeps to certain boundaries to ensure security.




Oracle Inheritance Map

The contracts in **RED** are each examples of different oracle implementations that can be used/implemented for certain oneTokens. Each implements separate logic and can be used as a price feed for certain assets.

1. **UniswapOracleSimple.sol**: Averages observations over configurable (but unchangeable) time periods. Returns a price in a configurable (but unchangeable) token. Multiple instances can support multiple time-periods or different index tokens. A single instance can be shared and has the ability to observe multiple quotes for multiple tokens using the same (unchangeable) time-period and index currency. Only Oracles that return quotes in registered Collateral tokens can be registered in the OneTokenFactory where it is assumed that all registered Oracles return a USD quote.

2. **ICHIPeggedOracle.sol**: Returns 1:1 without consulting external sources. Useful for gas optimization if the peg is assumed to be very strong.
3. **ICHICompositeOracle.sol**: Composes quotes from 2 or more other Oracles. For example, token:ETH feeding into ETH:USD would return a token:USD by executing both steps in series.

oneToken Governance determines which Oracle to use for each token in the oneToken Vault and sets the values of parameters the Oracle needs. Multiple different oneToken Vaults can share the same Oracle.

# Mint Masters

Minting Ratio for oneTokens

The Mint Master is singularly concerned with one action: computing a Minting Ratio for a given oneToken. It computes the Minting Ratio using internally-defined logic based on observable on-chain data within or without the ICHI system.

## Minting Ratio

The ratio of Collateral to project tokens required to mint a oneToken. For example, oneBTC at a 91% minting ratio would be minted with 91% USDC and 9% wBTC. The computation of the Minting Ratio is handled by external modules that are admitted by ICHI Governance and adopted into oneToken Vaults by their respective oneToken Governance.

Every oneToken has a **Minimum Minting Ratio** which is the minimum percentage of stablecoin that needs to be used to mint new oneTokens. oneToken holders can vote to adjust the Minimum Minting Ratio using the voting power calculated by the oneToken Governance contract.

## Incremental Mint Master Implementation

Similar to other components of the oneToken system, Mint Masters are modular and enable minting logic to be customized for each oneToken community's needs. the Incremental Mint Master is an example of a simple Mint Master that can be implemented for a oneToken instance.

The Incremental Mint Master implements a Minting Step Change which controls the amount a minting ratio can change. A change to the minting ratio happens everytime: (1) Someone mints a oneToken, (2) someone redeems a oneToken. Whether the price moves up or down depends on whether the oneToken price is slightly below/above $1. In this instance of a Mint Master:

- **Lowering** the Minting Ratio decreases the portion of value to mint that must be supplied by the user in the form of Collateral tokens, and increases the acceptable amount of the value to mint that can be supplied in the form of the Project Token - risk on.
- **Increasing** the Minting Ratio increases the portion of value to mint that must be supplied by the user in the form of Collateral tokens, and decreases the acceptable amount of the value to mint that can be supplied in the form of the Project Token - risk off.

E.g. When the market value of the Project Token is in decline this has the effect of lowering the Community Treasury value which, if unchecked, could lead to a Reserve Ratio of less than 100%. By extension, the contract could become illiquid. In this case, the Minting Ratio increases automatically when the price of the oneToken is beneath $1. The now higher Minimum Minting Ratio can accelerate a price adjustment as well as place a floor under the automatic adjustments. In both cases, increasing the ratio of Collateral to Project Tokens in the Community Treasury gradually (through minting transactions) adjusts the Collateral Ratio. As this is adjusted in favour of more Collateral versus Project Tokens, exposure to possible value decline in the Project Token is reduced (risk off scenario).




Risk on/Risk off opportunity with the Incremental Mint Master

Reminder: This is one possible instance of a Mint Master. The modularity of oneToken Architecture accommodates flexible design. Every oneToken has a Mint Master which can be shared with other oneToken instances.

# Collateral Tokens

USD hard pegged stablecoins held in Collateral Reserve

Collateral Tokens are specific external ERC20 contracts with strong pegs to 1 USD. They serve three primary functions - minting oneTokens, redeeming oneTokens, and Collateral Ratio calculation.

## Collateral in Minting and Redeeming oneTokens

Collateral Tokens are accepted and emitted in the Minting and Redemption processes. 0-n stablecoins are accepted in tandem with Project Token at a specific ratio, the Minting ratio, by the oneToken Vaults. Upon redemption of oneTokens, oneToken Vaults burn the oneTokens in return for stablecoins of equal value (Collateral Tokens) minus the redemption fee. Since more than one kind of stablecoin can exist in the oneToken Vault at any given time, multiple stablecoin options are always offered on a “while supplies last” basis.

> E.g. If the contract accepts USDC and USDT as Collateral then the user may be forced to accept multiple stablecoins when redeeming their oneToken. This would be the case if their oneToken holdings exceed the USD value of a certain stablecoin in the Collateral Reserve. Thus redeeming 100 oneSUSHI when the Collateral Reserve includes 75 USDC and 75 USDT, the redeemer could elect to get 75 USDC for 75 oneSUSHI in one transaction and 25 USDT for the other 25 oneSUSHI through a second redeem transaction.

Collateral Tokens are owned by the oneToken Vault. Admission of Collateral Tokens is up to ICHI Governance which administers the oneToken Vault and enforces boundaries over oneToken deployments.

> Note: Rebalancing Collateral Tokens could be accomplished manually if the oneToken Governance finds it beneficial, or automated as an ongoing process through a combination of Strategies and Controller logic.

# Strategies

Purpose built contracts that enable automated deployment of Community Reserves

A Strategy is a modular contract that is purpose-built for deploying Collateral and Community Treasury funds, receiving multiple types of tokens, and reporting balances of each type of token it holds. These are one-time transactions, not ongoing processes, that can perform atomic actions on the Community Treasury and Collateral, usually involving one or more interactions with external staking and farming contracts. Strategies could entail like-kind trades that may be desirable in connection with a change of Collateral, staking assets, hedging, and many other asset allocation schemes. Strategy can be purpose-built to work with any external contracts and interact with multiple token types at any given time.

## Characteristics and Limitations

1. Strategies must have functions to move funds around.
2. Strategies don't rely on whitelisted tokens.
3. Strategies can interact with multiple token types, but can only be assigned to one known token*.
4. Strategies automatically execute allocations of the assets allocated to them (by the Controller or oneToken Governance) from the oneToken Vault.

*A known token is one that has been registered to the oneToken Vault. This process includes configuration of the Oracles.

> E.g. The oneETH community has decided to put a Strategy in place that can provide ETH-ICHI to that respective pool on SushiSwap. They allocate 10% of their ETH and ICHI from their Treasury to the Strategy which will automatically deposit those tokens into the pool and get back LP tokens. At this stage the said Strategy may not be able to further deploy these LP tokens because it does not have that capability, depending on the developer's preference for modularity or completeness. The Controller could instruct the Strategy to send those LP tokens back to the oneETH Vault and for the Vault to send those to another Strategy focused on using those LP tokens to farm and receive yield for the oneETH

> treasury. Strategy allowances (ERC20) facilitate the transfers and also give Controllers an indication of governance objectives. For example, Strategy A with LP tokens and an LP token allowance of zero, plus Strategy B with an infinite LP token allowance could be interpreted by a Controller as an indication that governance wants to move the LP tokens from Strategy A to Strategy B when feasible and affordable (gas). Controllers can use any specialized logic to determine actions.

Similar to the other modular components in the ICHI and oneToken system, Strategies will be admitted via the ICHI Governance and selected by oneToken Governance. oneTokens assign 0-1 strategies per known token which can help a UI value tokens in the Vault. While a Strategy can interact with multiple tokens, the logic is specified to a single known token within the Vault.

Case 1:25-cv-00543-JLH Document 1-1 Filed 05/02/25 Page 61 of 84 PageID #: 93

# Controller

Fund allocation and management within the Decentralized Monetary Authority

---

The Controller's main function is to supervise and automate the transfer of funds between oneToken Vaults and Strategies. It can examine balances, other factors in the system, and any internal parameters (based on the Controller implementation) in order to rebalance funds. These configurable parameters do not need to be normalized across multiple Controller implementations.

Controllers can be reused across multiple oneToken instances and oneTokens can change Controllers. Each Controller is customized based on the features oneToken Governance wants to use.

# Contracts

ICHI and oneToken Smart Contracts

Core ICHI (Mainnet)

| Contract | Mainnet Address |
|---|---|
| ICHI | 0x903bEF1736CDdf2A537176cf3C64579C3867A881 |
| ICHIStake (xICHI) | 0x70605a6457B0A8fBf1EEE896911895296eAB467E |
| **oneTokens** | |
| OneTokenFactory | 0xd0092632b9ac5a7856664eec1abb6e3403a6a36a |
| Basic Null Controller | 0x81c9932bd9a87e454710ef83551ac32dd808630e |
| Incremental Mint Master | 0x58254B405E85359Fc7Eb3b8856bA82A4dD7C82E2 |

oneTokens (Mainnet)

| Contract | Mainnet Address |
|---|---|
| **V2** | |
| **oneUNI** | 0x8290d7a64f25e6b5002d98367e8367c1b532b534 |
| oneUNI Strategy | 0x6287d56e246eee33bead2d7dd3a99db693f4554c |
| **onePERL** | 0xd9a24485e71b9148e0fd51f0162072099df0db67 |
| onePERL Strategy | 0x2Dfb5348CC20218426e566C1bD7B8b3789CBa9d5 |
| PERL Oracle | 0x3134CB69297C965CAf2aC5C4FDb46B4a77352439 |
| **oneMPH** | 0xBE3F88E18BE3944FdDa830695228ADBB82fA125F |
| oneMPH Strategy | 0xf1587cb51349cdf5bb408845249de36466c35f41 |

| | |
|---|---|
| MPH Oracle | 0x0220864A5C899B0848a5797ca84B34CC494293cA |

Core ICHI (Kovan Testnet)

| Contract | Mainnet Address |
|---|---|
| oneToken Factory | 0x6a47Dd32FC2737De5881d63FeC9f27670297fbE5 |
| Incremental Mint Master | 0x17262ba85266FEdbDF3D22Eee5414ef77045Ff0a |
| Null Controller | 0xE5e6Ba3629DC563942578623992aC08A64142aCF |

# Grants

Organizations who provided grants to ICHI.

Amount

| Reference | | |
|---|---|---|
| Accomplice Blockchain and Collider Ventures | $200k + $200k liquidity provision | Snapshot |
| Moonbeam | 5k $RIVER and 5k $GLMR | Snapshot |
| Wing | 1,500 $WING | Snapshot |
| Strudel | 1 $VBTC + $10k $USDC | Snapshot |
| Solana | Development Cost | |

# Liquidity Providers

Organizations providing liquidity incentives to ICHI

Ichi related token pools have been selected by multiple third party protocols for additional rewards of oneToken or ICHI pairs.

| Provider | Amount | Reference |
|---|---|---|
| Loopring | 20% boost in $LRC rewards | Snapshot |
| 1inch | $500k $1INCH | Snapshot |

# Audits

Third Party audits of ICHI

---

There have been five audits of ichi.farm, listed from most recent:

1. Quantstamp: https://github.com/ichifarm/ichi-oneToken/blob/master/audits/quantstamp/audit.pdf
2. Solidified: https://github.com/ichifarm/ichi-oneToken/blob/master/audits/solidified/audit.pdf
3. CertiK: https://t.co/bLYbCI4vds
4. defiyield.info: https://defiyield.app/audits/defiyield/ichi
5. Bramah Systems: https://github.com/ichifarm/audit

⚠ Remember, no audit can catch all problems. Please review the risks tab to understand the risks involved with participating on ichi.farm.

# Risks

> Providing liquidity to ichi.farm or minting stable coins on ichi.farm is not without risks. Please don’t supply your life savings, or assets you can’t afford to lose, to ichi.farm.

## Minting

When minting ichi.farm stable coins, you are exposed to some risks:

1. Smart contract issues, bugs, or economic loopholes/exploits with the ichi.farm protocol
2. Risks with the digital assets used as collateral, typically stable coins:
   - Maker Dao risks: https://makerdao.com/en/whitepaper/#risk-parameters-controlled-by-maker-governance
   - USDC risks: https://support.usdc.circle.com/hc/en-us/articles/360001314526-Circle-USDC-Risk-Factors
   - USDT risks: https://tether.to/legal/
3. Market, trading, liquidity, and exchange risks associated with non-collateral, cryptocurrency assets
4. Governance risks: Governance could make poor decisions on treasury management or important stable coin parameters, such as minimum reserve percentage

## Liquidity Provision

When providing liquidity to the ichi.farm exchange, you are exposed to many risks:

- Smart contract issues
- Impermanent loss: https://cointelegraph.com/news/report-impermanent-loss-on-uniswap-and-other-amms-is-always-permanent
- Market, trading, liquidity, and exchange risks

## Farming

When staking liquidity pool tokens to get ICHI, the ichi.farm governance token, you are exposed to many risks:

- Smart contract issues
- Market, trading, liquidity, and exchange risks

# ICHI Concepts

Keywords used in the ICHI ecosystem

| **Keyword** | **Definition** |
|---|---|
| ICHI | Governance token of the ICHI community. |
| xICHI | A representation of the share of staked ICHI. The value of xICHI will increase in terms of ICHI as additional ICHI is paid to the xICHI contract. |
| ICHI Governance | Overarching governance of the ICHI system. ICHI uses community voting. Voters (ICHI holders) make decisions based on Proposals which then instruct multiple signers to use a multisig to act as governance. In the contracts, governance is implemented as a single signer. ICHI Governance also has the ability to set boundaries for oneTokens. |
| Decentralized Monetary Authority (DMA) | Enabled through innovations in smart contracts and AMMs, DMAs provide any community with a set of audited contracts that allow them to manage their own stable currency in the same way a central bank manages the currency of a country. Through the separation of smart contract deployments and token issuance DMAs put both issuance and governance rights directly in the hands of community members. |

# oneToken Concepts

Keywords used in the oneToken ecosystem

| Keyword | Definition |
|---|---|
| oneToken System | An instance of modular contracts used to create a community stable coin governed by oneTokenGovernance. |
| oneTokens | Produced stable tokens which are created for cryptocurrency communities backed by both a collateral reserve and community treasury. |
| Collateral | Existing stablecoins that maintain a hard peg to USD. You may claim $1 of collateral reserves when redeeming an ICHI stablecoin while supplies last. oneTokens can accept multiple stablecoins for Collateral. Therefore, the amount of each stablecoin is an upper limit of how much can be redeemed of that specific stablecoin. E.g. If the contract accepts USDC or USDT as Collateral then the user may be forced to accept multiple stablecoins when redeeming if their oneToken holdings are larger than the Collateral of a single stablecoin. |
| Collateral Reserve | The USD value of the collateral. |
| Member Coin | Cryptocurrencies that have their own oneToken (an ICHI stablecoin). |

| | |
|---|---|
| Community Treasury | The USD value of the non-collateral assets (including Member Coins) for a specific oneToken. |
| oneToken Governance | Governance of specific oneToken instances with user votes weighted by their holdings of the corresponding oneTokens in specific liquidity pools. oneTokenGovernance can replace oneToken modules or upgrade the core contract using the Proxy pattern. NOTE: This is external (from the perspective of these contracts), the "owner" and signer of these actions is a singleton. Decisions that were voted on go to trustees who use a multisig wallet to sign transactions that administer the oneToken instance. |
| Minting oneTokens | Providing stablecoins + member coins at the defined minting ratio in order to receive oneTokens. |
| Minting Ratio | The percentage of Collateral required to mint a oneToken. For example, oneBTC at a 91% minting ratio would be minted with 91% USDC and 9% WBTC. The Minting Ratio goes up/down based on what the Mint Master module decides to do. This is intentionally modular to allow for different logic to be applied. |

**Architecture Components**

| Component | Function |
|---|---|
| oneToken Factory | A contract that acts as a oneToken deployment mechanism. Global (ICHI) |

| | |
|---|---|
| | state information is stored and managed in this system-wide hub. |
| oneToken Governance | Governance of specific oneToken instances with user votes weighted by their holdings of the corresponding oneTokens in specific liquidity pools. oneTokenGovernance can replace oneToken modules or upgrade the core contract using the Proxy pattern. |
| oneToken Vault | The core upgradeable (through a Proxy upgrade) contract owned by oneToken Governance that holds assets, mints and burns ERC20 tokens, and controls the process flow during the minting and redemption process, including coordinating modularized components. |
| Versions | oneToken Vault implementations that are published by deployers and admitted to the network by ICHI Governance. oneToken Governance can optionally adopt (upgrade, downgrade) an approved version of the oneTokenVault. |
| Oracles | Price feed modules that report the value of assets in the oneToken Vault through a normalized interface. The oneToken Vault passes Oracle price conclusions and volatility signals to Mint Master modules. |
| MintMaster | A Mint Master uses any available information to compute the current minting ratio. The Minting Ratio adjusts over time to maintain the exchange rate peg of a oneToken to 1 USD. The interface includes a maximum transaction volume figure (can be infinite) to |

| | |
|---|---|
| | accommodate anticipated future logic requirements. Since the rate can be up to 100% and the maximum volume can be as low as zero, the Mint Master can be a circuit-breaker if so desired. Oracles report volatility. MintMasters decide what to do. |
| Collateral Tokens | 0-n stablecoins that are accepted in tandem with Member Tokens at the Minting Ratio, by the oneToken Vaults. Upon redemption of oneTokens, oneToken Vaults burn the oneTokens in return for stablecoins of equal value (Collateral Tokens). Since more than one kind of stablecoin can exist in the oneToken Vault at any given time, multiple stablecoin options can be given upon redemption. While there will likely be sufficient Collateral to back all outstanding oneTokens, each specific stablecoin is redeemable on a "while supplies last" basis. |
| Strategies | Trading contracts that invest funds in yield-farming contracts, receive other types of tokens and report balances of each type of token they hold. A Strategy interfaces with a oneToken contract through the Controller. The interface to the Controller defines the minimum viable requirements to be a compatible contract. Strategies will be admitted via the ICHI Governance and selected by oneToken Governance. |

| | |
|---|---|
| Controller | A global contract that executes the appointed strategies for a given oneToken Vault at the specified period of time. The Controller also implements system-wide invariants such as enforcing conservation of value or allowable fees/slippage rules. |

# DeFi Concepts

Decentralized Finance concepts and their definitions/relevance to ICHI

| **Keyword** | **Definition** |
| --- | --- |
| Stablecoin | A coin designed to remain at $1 of value. You may mint stablecoins by depositing $1 of value in two parts: part collateral coins, part member coins. These are typically named oneX where X is the member coin. For example, oneBTC is Bitcoin's stablecoin and oneETH is Ethereum's stablecoin. |
| Liquidity Pool | Multi-asset pools of crypto that enable swapping between the respective assets in those pools. ICHI leverages liquidity pools to maintain the price of stablecoins. Here is a resource that explains this concept: https://uniswap.org/docs/v2/core-concepts/pools/ |
| Liquidity Farm | ICHI sponsored farms that enable liquidity providers to earn rewards for depositing LP tokens from said pools. |

# Frequently Asked Questions

Frequently Asked Questions about ICHI and oneTokens

---

**ICHI**

**ICHI** is a self-sustaining, community governed platform that enables any third party cryptocurrency community to create and govern their own in-house, non-custodial **oneToken** (a stablecoin valued at $1) with a **Decentralized Monetary Authority (DMA)**.

## What was ICHI V1?

ICHI V1 was a pilot project that demonstrated the feasibility of a new stablecoin design. It launched successful stablecoins for large cap (Bitcoin, Ethereum, and Chainlink), mid cap (Wing.finance) and small cap (Strudel.finance) cryptocurrency communities. Each of these stablecoins remained pegged to $1 during the Q1 2021 bull market and the May 2021 market correction. These V1 stablecoins will continue to work indefinitely on the Ethereum network as unstoppable financial infrastructure. (Find ICHI V1 at https://www.ichi.farm/)

## How is ICHI V2 different?

The defining concept of ICHI V2 is a Decentralized Monetary Authority (DMA). DMAs give any cryptocurrency community the ability to hold their scarce cryptocurrency which they believe will increase in value over time (store of value) while also governing their own oneToken (an ICHI stablecoin). Their oneToken will provide their community with USD exposure in decentralized finance, the ability to transact with stable currency, and adoption discounts and incentives. A community no longer needs to pay their own scarce project tokens in exchange for stablecoins created by other communities or institutions**. (Find ICHI V2 at https://app.ichi.org/)**

## What are ICHI rewards?

ICHI rewards are distributed with every block on the Ethereum network at a current rate of 0.25 ICHI/block. 50% of the rewards are distributed to liquidity providers for oneToken pools while the other 50% of rewards are distributed to liquidity providers for Ichi pools. The oneToken pools are rewarded proportional to the number of oneTokens minted while the Ichi pools are rewarded proportional to the amount of non-Ichi liquidity.

## How do I earn ICHI rewards?

Anyone who participates in yield farming by providing liquidity to oneToken or Ichi liquidity pairs can earn ICHI rewards (i.e. farming).

## Who is behind ICHI? When did it start?

The total 5 million ICHI was minted in November of 2020 as a completely fair launch with no pre-mines, ability to create more ICHI, and community driven governance from day 1.

Since that launch, the Ichi community has hired full time staff with experience from Amazon, IBM, Microsoft, as well as multiple DeFi and crypto-native projects.

## What are ICHI halvings?

An ICHI halving event is when the rewards for farming ICHI are cut in half. ICHI halvings happen when the ICHI community puts forward a proposal to have a halving and passes it. Learn more on the Halvings page.

## Can the ICHI treasury be used on things other than farming?

Yes, the ICHI treasury can be used on any proposal passed by the ICHI community. Learn more at on the Community Treasury page.

## When does xICHI get paid ICHI? Can I see an APY?

xICHI holders who have participated can be rewarded by oneToken treasuries, in proportion to their contributions. There is no specified schedule or even guarantee of such rewards. Rewards to xICHI holders are announced via Telegram and can be found in the Week In Review (WIR) posts on ICHI's Medium.

## What is the ICHI token? How many are there?

ICHI is the governance token required for voting and provided as an incentive in the Ichi community. ICHI is hard capped at 5 million tokens and is distributed to liquidity providers on a per block basis on Ethereum.

## How can you afford to pay such high APYs?

APYs are calculated based on the trading fees and token incentives which accrue to liquidity providers for specific liquidity pools. The APY is calculated off of the historical data in each of these categories meaning that it is a point in time approximation.

## How does ICHI earn rewards?

Each oneToken community can elect to establish yield generating positions with their collateral reserves or community treasuries. As these positions earn yield, they may choose to reward ICHI holders for participating in governance proposals. Only users who have participated in submission of proposals, commenting, reviewing and/or voting will be entitled to receive ICHI token governance rewards.

## How do I report a bug or an issue? Is there a bug bounty?

Issues can be opened on our Github repo or emailed to core@ichi.org. Validated bugs or exploits will be provided a reward.

**oneTokens**

oneTokens provide the hard peg of centralized stablecoins without sacrificing on decentralization. oneTokens keep their value at $1, are purely on-chain, and accrue a community treasury in each oneToken's cryptocurrency.

# How is it possible to mint a new ICHI stablecoin for $1 of value?

Decentralized oracles (live price feeds provided by networks of computers) determine the price of two assets in US dollars: USDC (a stablecoin issued by regulated financial institutions, backed by fully reserved assets, and redeemable on a 1:1 basis for US dollars) and the project tokens. You mint a new stablecoin by paying exactly 1 US dollar in two parts (part USDC and part project tokens) as calculated by these oracles.

# How is it possible to redeem an ICHI stablecoin for $1 of value?

You redeem a stablecoin for exactly 1 US dollar of USDC, less a redemption fee. The price of USDC in US dollars is provided by decentralized oracles.

# Why can't you just use the cryptocurrency (ie, Bitcoin) to do business activity?

You can't grow a business without the ability to predictably pay expenses, control risk, and/or set aside funds for taxes. That makes volatile, scarce coins unusable for real business. At the same time, it hurts every time you sell a coin for fiat currencies (money issued by governments rather than software) or stablecoins don't economically drive the value of that coin's treasury. ICHI makes it possible to community hodl (hold your coins rather than selling them) your favorite coin while also doing real business.

# What does 100% on-chain mean?

You can see the USDC collateral and the coins paid to mint on the Ethereum blockchain as well as the entire transaction history of minting, redeeming, and any treasury actions.

If the coins or USDC are used by the coin's community to create DeFi (decentralized finance positions), you can see these transactions and positions in the corresponding smart contracts.

## What is the community treasury?

You pay in project tokenss to mint that project's stablecoin. These coins remain in a community treasury because you only get back USDC when you redeem the coin's stablecoins. The coin's community decides what to do with this treasury by voting with the stablecoin itself. A common action may include selling part of the community treasury to buy more USDC and deposit it back into the stablecoin's USDC collateral.

## How does a community profit from a DMA?

Communities that create their own stablecoin with a DMA are able to introduce a stable medium of exchange for their economy without having to dispose of their native project tokens.

DMAs enable communities to:

- Create their own decentralized stablecoin
- Create a community treasury to incentivize adoption
- Earn yield on their own stablecoin
- Increase total value locked in their community

## Where can I use these oneTokens to do business? Why would anyone accept them?

There are three major markets for stablecoins: decentralized applications (DeFi), cryptocurrency applications (centralized exchanges, wallets, etc), and consumer applications (online shopping, everyday goods and services). Users will mint the first $10B stablecoins for DeFi, the next $100B for cryptocurrency applications, and trillions for consumer applications. This will take time but the community treasuries are able to power the incentives and discounts necessary to make this happen.

## What happens if the scarce crypto goes down in value?

Ichi requires a minimum treasury reserve ratio of 150% in order to ensure 100% of oneToken redemption at $1. Decreases in scarce crypto value which put this ratio at risk should result in purchasing of additional collateral tokens or unwinding of yield bearing positions.

In the May market volatility all oneTokens were able to maintain their pegs to exactly $1 while few other stablecoins did.

EFiled: Apr 08 2025 11:07AM EDT
Transaction ID 76013865
Case No. 2025-0374-

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HASH ASSET MANAGEMENT LTD., TAF CAPITAL PTY LTD, as trustee for the BLUEBOTTLE FUND, and NI KAIHAO,<br><br>Plaintiffs,<br><br>v.<br><br>DMA LABS, INC., ICHI FOUNDATION, NICK POORE, and BRYAN GROSS,<br><br>Defendants. | CASE NO.<br><br>**DECLARATION OF PAUL SIBENIK** |

I, Paul Sibenik, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have conducted an investigation concerning the collapse of a cryptocurrency ‘liquidity pool’ known as Rari Pool 136, which was created by and associated with the ICHI Foundation.

2. More specifically, I have assessed if there is reason to believe whether the founders of the ICHI Foundation and/or those closely associated with them, including DMA Labs Inc., maybe have either been behind or played a role in the collapse of Rari Pool 136 itself for their own financial gain. Additionally, I have assessed whether there is any indication of insider trading by individuals that were part of or associated with the ICHI Foundation (the “ICHI Team”).

3. I am the Lead Case Manager at CipherBlade, a leading blockchain forensics and cybercrime investigative firm which consults with blockchain projects, numerous police, law enforcement and regulatory agencies around the world, including the US FBI and US Secret Service, cryptocurrency exchanges, and other organizations. Other CipherBlade staff and I have experience in some of the most high-profile cryptocurrency investigations to date in relation to a wide range of niches including but not limited to cases involving hacking, theft, SIM-Swapping, ransomware, different types of frauds and scams (e.g., involving ICOs, NFTs,

investment fraud, Ponzi Schemes), 'rugpulls,' embezzlement, as well as civil matters such as divorce cases and bankruptcy cases. I am recognized as one of the few experts in blockchain forensics and cryptocurrency cybercrime investigation. This work regularly requires the analysis of cryptocurrency transactions, wallets, and addresses, alongside gathering and analyzing other data sources.

4. In my work, I frequently analyze cryptocurrency transactions and addresses often but not always involving one or more of the investigative niches previously mentioned. Using a variety of forensic techniques, Bitcoin ("BTC") and Ether ("ETH") can be tracked, and assessments can be made to associate wallets and addresses with one another, which enables an investigator like me to discern control or ownership of a given wallet or address, by comparing and cross-referencing public blockchain data with other data sources. I am regularly instructed to track cryptocurrency, and in particular, identify money laundering in my investigations. Individual(s) laundering funds often lack understanding regarding just how cryptocurrency can be tracked; they often "make mistakes" when laundering funds, and it effectively allows me to identify control of given cryptocurrency wallets and addresses. The number of transactions involved is often in the hundreds or even thousands in each case, particularly when the cryptocurrency is broken up into smaller denominations in an attempt to obfuscate the flow of funds.

5. I regularly use blockchain forensics software to assist me in blockchain investigations. In this case, as part of the scope of this declaration, I have utilized Chainalysis Reactor, which is the leading blockchain forensics software available and is utilized by various law enforcement agencies around the world, including the FBI, Secret Service, DHS, and DEA in the United States. Chainalysis Reactor helps professionals to better understand the flow of funds on assets on the Ethereum blockchain (in addition to a variety of other blockchains that Reactor supports, such as Bitcoin). It helps to aggregate and manage large amounts of transaction data and addresses to make the data more parsable. It helps professionals like me to better understand which addresses are under the control of the same individuals or entities, and

for addresses that are under the control of a service or exchange, it is often able to identify the name of that service or exchange. Furthermore, Chainalysis Reactor also provides Open-Source Intelligence (OSINT) on various cryptocurrency addresses, which can help investigators understand what those addresses may be associated with or can provide additional context in situations. I have a Chainalysis Reactor Certification (CRC), which is a certification offered by Chainalysis to certify knowledge and understanding of their Reactor forensics tool. I also have the Chainalysis Investigation Specialist Certification (CISC), an additional certification by Chainalysis designed specifically for the most advanced Reactor users, which dives deep into advanced investigative techniques and obfuscation approaches sometimes used by individuals trying to launder ill-gotten cryptocurrency. I furthermore have the Chainalysis Ethereum Investigations Certification (CEIC), a certification program focused on Ethereum, as well as other EVM (Ethereum virtual machine)-compatible cryptocurrencies.

6. Additionally, a large portion of my work involves consulting with blockchain companies in various capacities pertaining to preventative measures they can or should take to reduce risks and mitigate the amount of cybercrime that their company is exposed to. This involves consulting on security practices, including those pertaining to cryptocurrency storage and management. This also involves consulting on matters of compliance so as to significantly mitigate the likelihood and/or frequency of ill-gotten funds being laundered through their service and reduce the amount of various types of fraud, including investment scams, romance scams, impersonation scams, and money muling.

7. A copy of my CV is attached in Appendix A.

8. I have provided some relevant definitions in Appendix B.

9. I reserve the right to amend the views expressed in this declaration should any additional evidence be disclosed at a later stage.

10. Prior to accepting instructions to act in this matter, I made reasonable inquiries to identify any actual or potential conflicts of interest in connection with the parties concerned. No matters arose.

11. Rari Pool 136 was built using Fuse protocol, which is a permissionless protocol.[1] The protocol allows individuals and teams to create 'pools' consisting of cryptocurrency deposits of various depositors. However, pool creators and operators (including the ICHI Team) must design and specify various parameters of the pool. It is critically important for 'pools' to be designed in a sound and secure manner to prevent an exploit or undue manipulation from happening.[2]

12. It is evident that a series of design flaws in the Rari Pool 136 existed.

13. Many of these flaws that increased the risk of collapse include but are not limited to:

a) An 85% Loan-to-value (LTV) ratio.

b) Users were permitted to deposit an unlimited amount of ICHI tokens as collateral to borrow stablecoins.

c) There was no supply cap on the amount of assets that could be deposited into Rari Pool 136.

14. The collapse of Rari Pool 136 came about because select user(s) came up with and utilized the following scheme to make money:

a) First, the cryptocurrency issued by the ICHI Team, ICHI, were deposited into the Rari Pool 136 and used as collateral.

b) Second, select user(s) would then borrow stablecoins from the pool.

c) Third, the stablecoins acquired could then be used to buy more ICHI. This would naturally create demand for ICHI and caused the price of ICHI (relative to USD) to increase considerably.

d) Fourth, ICHI could then also be deposited into the Rari Pool 136 as collateral to borrow even more stablecoins. And the cycle continued thereafter.

---

[1] https://sports.yahoo.com/news/ichi-tokens-plunged-90-bad-095919003.html.

[2] https://twitter.com/JackLongarzo/status/1513587620198207494.

Case 1:25-cv-01643-JLH Document 31 Filed 12/30/25 Page 5 of 12 PageID #: 22

15. The sustainability of Rari Pool 136 for a short time was made possible by an ever-increasing price of ICHI tokens. The ICHI price increase was caused, in part, by the borrowing of funds from Rari Pool 136 itself. As soon as there wasn't enough buying demand for ICHI to sustain the inflated price, the Rari Pool 136 began to collapse. This quickly led to cascading liquidations of assets in the Rari Pool 136, of which an increasingly large portion of assets had become ICHI.[3] This caused the price of ICHI to collapse further. The price ended up collapsing from ~$142 USD to as low as $1.79, a drop of 99%. The majority of the drop occurred on April 11, 2022.[4]

16. In the paragraphs below, I provide some abbreviated technical evidence that suggests the individual(s) on the ICHI Team, many of whom operated anonymously and are unknown at this time, may have been involved in the exploitation of design flaws of Rari Pool 136 and/or engaged in insider trading with those who were involved. Or both. Exploitation and manipulation of Rari Pool 136 was done for financial gain.

17. There are a variety of different cryptocurrency addresses that are relevant. Below I have listed some of the relevant addresses that are controlled by the ICHI Team, and additionally, I include the reasons why such addresses are controlled by the ICHI Team:

a) 0x11111D16485aa71D2f2BfFBD294DCACbaE79c1d4

Description: Legacy ICHI Deployer / ICHI.farm deployer

Summary: This address deployed the legacy ICHI token contract 0x903bef1736cddf2a537176cf3c64579c3867a881 in transaction 0x9b1e9353dca3301faa911b5073c751a8195c66c4bdfa2d34ddc7b9ba1c3c385d and is labeled as 'ICHI.farm deployer' on Etherscan. Since the ICHI Team created the ICHI token (and ICHI token contract) and since 0x11111D16485aa71D2f2BfFBD294DCACbaE79c1d4 is responsible for doing this,

[3] As well as XICHI and LP tokens.

[4] https://www.coingecko.com/en/coins/ichi.

0x11111D16485aa71D2f2BfFBD294DCACbaE79c1d4 is controlled by someone (or multiple people) on the ICHI Team.

b) 0xC30220fc19e2db669eaa3fa042C07b28F0c10737

Description: New ICHI Deployer

Summary: Listed as 'ICHI: Deployer' on Etherscan. Created numerous ICHI contracts including 'ICHICompositeOracle.'[5] Sent a transaction to 'ICHI Deployer 2 (0xbf1bfd4352564eca6b7b1a2f0169b1081f73cf03),' which in turn created the new ICHI token contract (0x111111517e4929D3dcbdfa7CCe55d30d4B6BC4d6).

c) 0x0dd4C0c16Fff6693e169Ef89235Cb92F9D8943EE

Description: ICHI Deployer 1

Summary: Labelled as 'ICHI: Deployer 1' on Etherscan. This address is supposedly controlled by the CTO of ICHI, who goes by the name '37aces.'[6] The address also previously held the ENS domain '37aces.eth.'[7]

d) 0x94A5980d5634533551dcB7108322f6C4f2a80E6B

Description: ICHI Multisig

Summary: Labelled as 'ICHI Multisig' on Etherscan. This is a Gnosis multisig wallet controlled by member(s) of the ICHI Team.

e) 0x8f3c97DdC88D7A75b8c3f872b525B30932D3014c

Description: Rari Pool 136 admin

Summary: 0x8f3c97DdC88D7A75b8c3f872b525B30932D3014c is listed as the 'admin' of Rari Pool 136 on Rari capital's website.[8] It was created by 0x7b7B9e93CDAc35bba1927FCE27c156D83488ab60. Collectively, the two addresses send

[5] https://ww6.etherscan.io/address/0x6f85eb17955257a39fd78692f6884ebe6531fd8b#code.

[6] https://forums.dydx.community/account/0x0dd4C0c16Fff6693e169Ef89235Cb92F9D8943EE/.

[7] https://etherscan.io/nft/0x57f1887a8bf19b14fc0df6fd9b2acc9af147ea85/108738658586001166097941560871784711007330529340630702375356477043542709697822.

[8] https://app.rari.capital/fuse/pool/136/info.

Case 1:22-cv-01643-JLH Document 1-3 Filed 12/21/22 Page 7 of 12 PageID #: 142

and receive multiple transactions from other known ICHI-controlled addresses, including ICHI.farm deployer, ICHI Deployer 1, and New ICHI Deployer. This address is under the ICHI Team's control because the ICHI Team is publicly known to be the owner and operator of Rari Pool 136 and Rari Capital has confirmed this.[9] Thus, since 0x8f3c97DdC88D7A75b8c3f872b525B30932D3014c is the admin of Rari Pool 136, it must therefore be controlled by the ICHI Team.

f) 0x4Fe5f268e5053a05108eBAF13EbD9a825e6fB6f2

Description: ICHI Pool deployer

Summary: Rari Pool 136 is associated with ETH contract address 0xAbDFCdb1503d89D9a6fFE052a526d7A41f5b76D6, and this smart contract was deployed by 0x4Fe5f268e5053a05108eBAF13EbD9a825e6fB6f2. 0x4Fe5f268e5053a05108eBAF13EbD9a825e6fB6f2 receives 4.33 ETH from the ICHI.farm deployer and 2.4 ETH from ICHI Deployer 1. It is publicly known that the ICHI Team created, designed, and operated Rari Pool 136, and thus, 0x4Fe5f268e5053a05108eBAF13EbD9a825e6fB6f2 would be controlled by the ICHI Team. 0x4Fe5f268e5053a05108eBAF13EbD9a825e6fB6f2 is the fourth largest holder of bad debt with $5.64M USD of bad debt.

g) 0xcC50953A743B9CE382f423E37b07Efa6F9d9B000

Description: ICHI Token distributor

Summary: This address was created by the ICHI.farm deployer which is controlled by the ICHI Team. The address was primarily used to distribute small amounts of ICHI.farm tokens to many different users.

18. Before going further, it is important for me to discuss the concept of 'bad debt' and why it's important. The holders of 'bad debt' deposited assets into Rari Pool 136 before the collapse of Rari Pool 136 in order to take out loans. The value of the assets that were held in collateral in Rari Pool 136 collapsed leading to the aforementioned cascading liquidations. But

[9] https://twitter.com/RariCapital/status/1513567245565321232.

Case 1:25-cv-01563-JLH Document 1-1 Filed 05/02/25 Page 8 of 12 PageID #: 25

for holders with bad debt, the collateral they deposited to Rari Pool 136 ended up not being sufficient to cover their liabilities. This means that holders of bad debt have unjustly benefitted since they ended up not paying back debts that they owe to Rari Pool 136.

19. When a user has some 'bad debt' it does not necessarily suggest purposeful exploitation of Rari Pool 136 by those users. In many cases, particularly for addresses with small amounts of bad debt, there is no reason to assume malicious intentions on the part of those users. However, users that managed to accrue a large amount of bad debt (some in the millions of dollars) should be assessed more critically, since it suggests that some of those users could have known that they were exploiting design flaws in Rari Pool 136 and knew it would likely collapse at some point as a result of continuing to leverage ICHI and borrowing stablecoins.

20. Just as critically as having large amounts of bad debt, is how closely connected the addresses of many of the largest 'bad debt' holders are on the Ethereum blockchain, oftentimes directly to one another, and at other times to known addresses belonging to the ICHI Team. In my opinion, it's very suspicious and indicative of insider involvement.

21. Some of the most pertinent addresses that I have identified that are relevant to this matter are indicated in the paragraphs below. Some addresses are likely to be controlled by ICHI Team members, some may be controlled by ICHI Team members, and some may be controlled by individuals or entities ICHI Team members transacted with. Some addresses withdrew significant amounts of stablecoins from Rari Pool 136 in the lead up to its collapse, and some of the addresses listed below could aptly be described as suspicious.

22. 0xc8b5c6363ad036883fc663766ecd87928ad3dc36 '0xc8b5' – this address is the largest holder of bad debt (over $15.4M USD).

a) It received 10 ICHI directly from the ICHI.farm deployer address in transaction 0x11966040c6ec5e30db80b77ad8243aff49de34b3807d70f44dd1406ad94d858f. The reasons for this transfer are unclear. While it is quite a small amount of money, the significance should not be understated. This suggests, at the very least, that the ICHI Team

Case 1:25-cv-00533-JLH Document 1-1 Filed 05/02/25 Page 9 of 12 PageID #: 26

knows and has a relationship with the owner of '0xc8b5.' But it's also distinctly possible that the owner of '0xc8b5' may be part of the ICHI Team.

b) This address received 580 ICHI in transaction 0x4f3c548cf4ccc208611f72bf2659c628075dc9ab91a25d7520012ad2a365c74b from 0x2dddb6a69f071313580073941a4491313303b1ab, which in turn interacts with various known ICHI-controlled addresses, including the ICHI.farm deployer address.

c) There is evidence that suggests that the owner of '0xc8b5' may control a variety of other addresses that also have bad debt. This includes the addresses 0xD1895682591Ac2751b10c11f0124FA46E8471562 and 0x420b02fbb51D65ed2Aa877e8b747160699ae0267. For reference, this information could be utilized to help identify the owner of '0xc8b5' if needed.

d) It is directly connected to many other addresses that also have a significant amount of debt, even if the owner of the '0xc8b5' doesn't control those addresses. The address sent a considerable amount of ICHI to other addresses that have significant bad debts, and those addresses then leveraged ICHI tokens in the same manner. This could be indicative of an insider trading scheme that would have played a critical role in the downfall of Rari Pool 136.

23. 0xFb06EC3296Ae0985f66a72C7efAB5b27618D0D00 – with ~$12.2M USD of bad debt, this is the third largest holder of bad debt. It received 1852 ICHI from directly '0x4fe5' 'ICHI Pool Deployer,' which, as discussed, should be controlled by the ICHI Team. This suggests that 0xFb06EC3296Ae0985f66a72C7efAB5b27618D0D00 could belong to an insider.

24. 0xD1895682591Ac2751b10c11f0124FA46E8471562 'ozgjoker.eth' – This address has a minimal amount of bad debt. However, the owner of this address could be the same as the owner of '0xc8b5' based on blockchain analysis I have conducted. The two addresses interact with each other numerous times. This address owns the ENS domain 'ozgjoker.eth.' I have not found anyone publicly claiming to own the ozgjoker.eth handle, but

a quick Google search reveals someone using the handle 'ozgjoker' who appears to be Turkish and claims his name is 'Özgün Turan Kaynar.'[10]

25. 0x420b02fbb51d65ed2aa877e8b747160699ae0267 – This address has ~$1.29M USD of bad debt. It sends and receives numerous transactions to/from '0xc8b5', and additionally, it sends multiple transactions to the same BTCTurk deposit address that '0xc8b5' and 'ozgjoker.eth' sent cryptocurrency to. Thus, the owner of 0x420b02fbb51d65ed2aa877e8b747160699ae0267 could be the same as the owner of '0xc8b5.'

26. 0x2dddb6a69f071313580073941a4491313303b1ab – This address has ~$812k USD of bad debt, and it interacts with various known ICHI-controlled addresses, including the ICHI.farm deployer address. It also interacts with '0xc8b5.' This suggests that the address could be controlled by an insider.

27. 0x4ac698cEAEbaa59A1882960727a44E5d42F8e75d – This is a BTCTurk deposit address that ends up receiving a considerable amount of funds associated with the exploit (well into the millions of dollars) from a variety of different addresses that had significant amounts of bad debt, to include '0xc8b5', 'ozgjoker'eth,' 0x420b02fbb51D65ed2Aa877e8b747160699ae0267, and 0x71cEC0e5114798F5C369C3Ce931095dACCB17B5C to name a few.

28. 0x639e517d146C8f01d6e20c1B470989Fd778d3602 – An additional BTCTurk deposit address that receives transactions from various addresses with significant amounts of bad debt, including '0xc8b5.' The amount of money involved is noticeably lower than 0x4ac698cEAEbaa59A1882960727a44E5d42F8e75d, however.

---

[10] https://www.instagram.com/ozgjoker/?hl=bn, https://tr.pinterest.com/ozgjoker/_saved & https://www.youtube.com/playlist?list=PL8KFClGPp7LLv9KpHGk7t72LOJs3zvLMn (webpages have also been archived in case they are deleted). Note that the unused pinterest profile contains the following statement "Can Someone Please Show Me How Deep The Rabbit Hole Goes?" While the rabbit hole idiom originates from Alice in Wonderland, the concept of 'going down the rabbit hole' with respect to cryptocurrency is a common expression that cryptocurrency users describe. Additionally, at least one of the videos on the Youtube playlist has a focus on cryptocurrency staking.

29. 0x545683Ae74cFC8845e7033e0B0C91cE6623Dd2a6 – A Binance deposit address that receives transactions from various addresses with significant amounts of bad debt, including 0x591583182fC7D28a52477444dBc597636ac44FBC, 0x71cEC0e5114798F5C369C3Ce931095dACCB17B5C, and 0x0EAd347d565aC2Cf5b42595be53EDF343E52B9d9.

30. Apart from some of the addresses already mentioned, I've included a short list of some of the addresses that '0xc8b5' (which, as mentioned, has connections to the ICHI Team) directly interacts with, which also happen to have notable bad debts:

- 0xd4154916d1330A7eAb4bF3e21295295805A1AB4f (~$13M USD) (second largest holder of bad debt)
- 0x1fc9cd26854dd3b7c74a36424e130887334a993e (~$2.47M USD)
- 0xE4f4d41Bd8DA7AE7e638aEaC9800E67FCd8E2858 (~$3.1M USD)
- 0x0ead347d565ac2cf5b42595be53edf343e52b9d9 (~$1.89M USD)
- 0xD4099Bb6D81E2eA661C6C0417fEC4292D48926Df (~1.52M USD)
- 0x1830955Ba1Ca0a0319857015184E56981ce4877c (~$295k USD)
- 0x591583182fC7D28a52477444dBc597636ac44FBC (~$186k USD)
- 0x71cEC0e5114798F5C369C3Ce931095dACCB17B5C (~$194k USD)

31. Based on my analysis of blockchain data, events, and the situation thus far, I have come up with the following conclusions:

a) Many of the addresses with significant amounts of bad debts are often directly connected to one another. This suggests a small number of user(s) were involved in the exploit of Rari pool #136.

b) It appears that at least one address that can be ascertained to be controlled by the ICHI Team has a significant amount of bad debt.

c) Some of the other addresses with significant amounts of bad debt might also be controlled by individuals that were part of or affiliated with the ICHI Team.

d) The ICHI Team directly transacted numerous times with multiple suspicious addresses that have significant amounts of bad debt. This is suggestive of insider trading by the ICHI Team with an unknown individual(s) who played a critical role in the collapse of Rari Pool 136.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 21st day of December 2022.

**DATED**: December 21, 2022
Vancouver, British Columbia, Canada

By:____________________________________
Paul Sibenik

EFiled: Apr 08 2025 11:07AM EDT
Transaction ID 76013865
Case No. 2025-0374-

# EXHIBIT C

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:58 PM 10/25/2021
FILED 02:58 PM 10/25/2021
SR 20213604554 - File Number 6335126

# CERTIFICATE OF INCORPORATION

# OF

# DMA LABS INC.

## ARTICLE I

The name of the corporation is DMA Labs Inc. (the "Corporation").

## ARTICLE II

The address of the Corporation's registered office in the state of Delaware is 651 N. Broad Street, Suite 206, in the city of Middletown, zip code 19709. The name of its registered agent at such address is LegalInc Corporate Services Inc.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

## ARTICLE IV

The aggregate number of shares which the Corporation shall have authority to issue is Eleven Million (11,000,000) shares of capital stock all of which shall be designated "Common Stock" and have a par value of $0.00001 per share.

## ARTICLE V

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Elections of directors need not be by written ballot unless otherwise provided in the Bylaws of the Corporation. In furtherance of and not in limitation of the powers conferred by the laws of the state of Delaware, the Board of Directors of the Corporation is expressly authorized to make, amend or repeal Bylaws of the Corporation.

Distributions by the Corporation may be made without regard to "preferential dividends arrears amount" or any "preferential rights," as such terms may be used in Section 500 of the California Corporations Code.

## ARTICLE VI

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil,

administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director or officer of the Corporation or any predecessor of the Corporation, or serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.

Neither any amendment nor repeal of this Article VI, nor the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this Article VI, shall eliminate or reduce the effect of this Article VI in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article VI, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

**ARTICLE VII**

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (A) any derivative action or proceeding brought on behalf of the Corporation, (B) any action or proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (C) any action or proceeding asserting a claim against the Corporation arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's Certificate of Incorporation or Bylaws, or (D) any action or proceeding asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

**ARTICLE VIII**

The name and mailing address of the incorporator are as follows:

Richard Bryan Gross
2093 Philadelphia Pike #9008
Claymont, DE 19703

Executed on October 20, 2021.

/s/ Richard Bryan Gross
Richard Bryan Gross, Incorporator

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| DMA LABS INC. | 2022 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 6335126 | 2021/10/25 | |

PRINCIPAL PLACE OF BUSINESS
2500 REGENCY PARKWAY #500
CARY, NC 27518

PHONE NUMBER
(984)464-1204

REGISTERED AGENT
LEGALINC CORPORATE SERVICES INC.
651 N BROAD ST
SUITE 201
MIDDLETOWN DE 19709

AGENT NUMBER
9907686

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2021/10/25 | | COMMON | 11,000,000 | .0000100000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| RICHARD GROSS | 204 JASLIE DR<br>CARY, NC 27518 | CEO |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| RICHARD GROSS | 204 JASLIE DR<br>CARY, NC 27518 |
| NICHOLAS POORE | 105 COUNTRYSIDE LN<br>CARY, NC 27518 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| RICHARD GROSS<br>204 JASLIE DR<br>CARY, NC 27518 US | 2023/02/28 | CEO |

EFiled: Apr 08 2025 11:07AM EDT
Transaction ID 76013865
Case No. 2025-0374-

# EXHIBIT D

# Triangle crypto project raises $3.5M for DeFi effort

Triangle Business Journal (Raleigh/Durham, North Carolina)

February 4, 2022 Friday

Copyright 2022 American City Business Journal, Inc. All Rights Reserved

TRIANGLE BUSINESS JOURNAL

**Length:** 488 words

**Byline:** Lauren Ohnesorge

## Body

A Triangle-based crypto project just announced a $3.5 million raise.

The project, called ICHI, plans to use the raise to expand as projects like ShapeShift and Uniswap turn to it for what's called community-controlled DeFi.

In an interview, Bryan Gross, CEO of ***DMA Labs*** in Cary and steward at ICHI, describes DeFi - or decentralized finance - as offering financial instruments without relying on intermediaries such as brokerages or banks.

"Crypto networks, in general, create their own scarce asset, and sometimes that asset is used to govern their project, sometimes it's used for security purchases," he said. "But when that community needs to make payroll, pay taxes, do business, they then have to sell their scarce asset to get more usable currency."

What ICHI does is give that open-source community its own branded dollar, backed by its own scarce commodity, allowing it to essentially eliminate the regulator.

Normal transactions like lending require trusting that a bank will keep money safe and move it appropriately.

"Historically, they haven't been very trustworthy," he said. "We've had to create large government regulators to make sure those institutions treat you fairly."

With DeFi, you are always in control of your funds - making payouts directly, with no entity in the middle to ensure a transaction is safe. While DeFi has become a big deal when it comes to cryptocurrency adoption, it can be risky and expensive for projects that rely on it to conduct business.

That's where ICHI comes in, a project that aims to improve DeFi by giving crypto networks the tools they need to operate their own economies and have better control over their money.

Gross sees crypto as complementing - not coming into conflict with - traditional banks.

"I think the DeFi space will work closely with the centralized finance space," he said. "A lot of people, they have no interest in safeguarding their finances. They'd rather it be deposited into a bank that is regulated. ... DeFi could really be the back end of those banking institutions."

Gross said innovators are currently in the midst of experiments that will eventually be application interfaces that banks you're already using "will just adopt."

ICHI was created by a group of people working in open source throughout the globe. That community formed the foundation, and ***DMA Labs*** writes its software.

Participants in ICHI's private token sale included Lattice Capital, Fundamental Labs, GSR Markets Limited, Baller Ventures, Woodstock Fund, TRGC Limited, Ellipti Ventures, Lightshift, Collider Ventures, LD Capital and others.

According to ICHI, decentralized finance protocols currently account for more than $100 billion in value.

ICHI said it has already been used to launch nine branded dollars for the Uniswap, ShapeShift DAO, Filecoin, Fuse, 1inch, DODO communities and others.

Did you find this article useful? Why not *subscribe* to Triangle Business Journal for more articles?

**Load-Date:** February 7, 2022

---

**End of Document**